**TOP OF IOWA COOPERATIVE, an Iowa cooperative, Plaintiff,**

v.

**Virgil E. SCHEWE, Defendant.**

**No. C 96–3146–MWB.**

United States District Court, N.D. Iowa, Central Division.

May 25, 1998.

Brenton D. Soderstrum, Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, IA, for Plaintiff.

Matthew Benda, Peterson, Savelkoul, Schlichting & Davis, Ltd., Albert Lea, MN, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

BENNETT, District Judge.

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................ 847
     A.   Procedural Background ......................................... 847
     B.   Factual Background ............................................ 847

II.  LEGAL ANALYSIS ..................................................... 849
     A.   Standards For Summary Judgment ................................ 849
     B.   The Securities Exchange Act Claim ............................. 850
          1.   The Howey test ........................................... 850
          2.   Application of the Howey test to Schewe's HTAs ........... 851
     C.   The Commodities Exchange Act Claim ............................ 853
          1.   Schewe's HTAs ............................................ 854
          2.   Schewe's attempt to distinguish or dispute Oeltjenbrun .. 856
     D.   Inability To Recover Margin Calls ............................. 858

III. CONCLUSION ......................................................... 859

In another episode in the continuing agony inflicted on the grain industry by disputes over the enforceability of so-called "Hedge–To–Arrive" contracts (HTAs) for the sale and purchase of grain, the parties to the present lawsuit, a grain elevator and a grain producer, have filed cross-motions for partial summary judgment raising the key question in almost all of the cases involving HTAs, are certain HTAs illegal off-exchange "futures" contracts under the Commodities Exchange Act (CEA), 7 U.S.C. §§ 1–25, or valid "cash forward" contracts not within the regulatory purview of the CEA? This is the second time the court has reached the merits of this key question. *See Oeltjenbrun v. CSA Investors, Inc.,* 3 F.Supp.2d 1024 (N.D.Iowa 1998). However, as this court observed in *Oeltjenbrun,* the court must view *each* transaction or group of transactions separately, and, because the terms of HTAs differ from case to case, the results of the court's analysis may differ for each kind of contract. In addition, the present dispute raises a question this

court has not yet confronted: Are the HTAs "securities" within the meaning of the Security Exchange Act (SEA) that were sold in violation of the terms of that Act?

## I. INTRODUCTION

### A. Procedural Background

This lawsuit was filed by plaintiff Top of Iowa Cooperative, which operates a grain elevator in Lake Mills, Iowa, in the Iowa District Court for Winnebago County on August 12, 1996, against defendant Virgil E. Schewe, a farmer in Freeborn County, Minnesota. Top of Iowa's complaint alleges that Schewe has repudiated certain HTAs he had entered into with Top of Iowa by failing to give adequate assurances of delivery of grain pursuant to the HTAs. As the result of that repudiation, Top of Iowa alleges that it has sustained damages corresponding to the amount it has paid in margin calls on the Chicago Board of Trade on transactions it entered into as hedges against delivery of Schewe's grain.

Schewe removed this action to this federal court on October 7, 1996, asserting diversity of citizenship and sufficient amount in controversy. On October 11, 1996, Schewe filed an answer and counterclaim also asserting various affirmative defenses. Schewe's counterclaims allege (1) that the HTAs were "securities" within the meaning of the SEA and that they were not offered, engaged in, or sold in compliance with that Act; (2) that the HTAs are illegal off-exchange futures contracts in violation of the CEA and hence are unenforceable; (3) that Top of Iowa has violated the Racketeer Influenced and Corrupt Organizations Act (RICO); (4) that Top of Iowa's actions constitute negligence, breach of fiduciary duty, and breach of contract; and (5) that Top of Iowa has engaged in fraud and misrepresentation.

On March 12, 1998, Top of Iowa filed its motion for partial summary judgment asserting that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on Count I of Schewe's counterclaim, the SEA claim, Count II of the counterclaim, the CEA claim, and Schewe's affirmative defense asserting an illegal con-

tract. On April 16, 1998, Schewe sought leave of court to file his own cross-motion for partial summary judgment. That leave was granted, and Schewe's motion was filed on April 23, 1998. Schewe seeks summary judgment, first, on his affirmative defense No. 20, which seeks a declaration that the HTAs at issue are illegal off-exchange futures contracts that are unenforceable against him, and, second, dismissing Top of Iowa's cause of action for failure to state a claim upon which relief can be granted, because Top of Iowa is barred by the terms of the HTAs from recovering amounts allegedly paid in margin calls on the elevator's hedge transactions that relate to Schewe's HTAs.

The court heard oral arguments on the cross-motions for summary judgment on May 22, 1998. Plaintiff Top of Iowa was represented by counsel Brenton D. Soderstrum of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., in Des Moines, Iowa. Defendant Virgil E. Schewe was represented by counsel Matthew Benda of Peterson, Savelkoul, Schlichting & Davis, Ltd., in Albert Lea, Minnesota.

### B. Factual Background

The court will discuss here only the nucleus of pertinent facts for this litigation. In its legal analysis, the court will address where necessary the parties' assertions of genuine issues of material fact that may preclude summary judgment in favor of either party. The nucleus of pertinent facts begins with an examination of the HTAs Schewe has entered into with Top of Iowa.

At issue are five contracts, each denominated a "HEDGE TO ARRIVE CONTRACT," that Schewe entered into with Top of Iowa in the Spring and Summer of 1995. Each is in the form of the contract entered into on March 13, 1995, with handwritten entries, which vary from contract to contract, shown as underlined and paragraph numbers added by the court:

[1.] BUYER and SELLER agree to the following:

[2.] BUYER confirms the following futures transaction was made for seller today on the Chicago Board of Trade, Seller

agrees that said grain is yet to have the "CASH PRICE" determined for arrival;

[In tabular form:]

GRADE & GRAIN *US 2y Corn* ARRIVAL PERIOD *[Dec]* 95 DESTINATION *Lake Mills or Joice* QUANTITY *5,000* FUTURES OPTION *[Dec 9]5* FUTURES OPTION PRICE *2.60*

[3.] SELLER states knowledge of cash basis which is the difference between a designated futures option on the Chicago Board of Trade and the cash price of grain for the designated arrival period of this contract. SELLER understands that the Cash Basis has not been determined in establishing the "Cash Price" of said grain on arrival.

[4.] SELLER understands that the "Cash Basis" will be the difference between the price quoted for the futures options designated in this contract and the "Cash Price" of the grain for the designated arrival period in this contract on the date and time SELLER elects to set the cash price of said grain.

[5.] SELLER agrees to set the "Cash Basis" and determine the cash value of said grain on or before *11–15–95*. Unless other terms have been agreed upon by both Buyer and Seller prior to said date, and grain has not been priced by Seller, Buyer is authorized to set the cash basis and to set the cash price of contract.

[6.] Buyer shall be responsible for commissions and margin requirements of this transaction. Buyer agrees that this transaction shall be subject to the rules of the Chicago Board of Trade and the marketing policies of the Buyer.

[7.] SELLER agrees to a service fee of *.02* cents per bushel and the service charge will be assessed against the cash price of this contract.

[8.] Failure by the Seller to perform on this contract [sic], Seller shall be subject to all of the terms of the "Grain Purchase Contract and Confirmation" attached to and made a part of this contract.

[9.] This is NOT considered a credit sale contract as long as final price is determined before delivery.

Complaint Exhibit A; Exhibit A to Memorandum of Law of Plaintiff, Top of Iowa Cooperative, an Iowa Cooperative, In Support of Motion for Partial Summary Judgment. Although each of the contracts refers to a "Grain Purchase Contract and Confirmation" purportedly attached to the HTA, neither party has provided the court with a copy of such a document for any of the five HTAs.

Thus, the five contracts in question initially provided as follows: (1) Contract No. 0020, dated March 13, 1995, was for 5,000 bushels of corn with an "arrival period" of December 1995 at Lake Mills or Joice, Iowa, with a "futures option" of December 1995, at a "futures option price" of $2.60 per bushel; (2) Contract No. 0044, dated April 3, 1995, was for 5,000 bushels of corn with an "arrival period" of December 1995 at Lake Mills, Iowa, with a "futures option" of December 1995, at a "futures option price" of $2.65 per bushel; (3) Contract No. 0075, dated May 1, 1995, was for 10,000 bushels of corn with an "arrival period" of December 1995 at Lake Mills, Iowa, with a "futures option" of December 1995, at a "futures option price" of $2.64 per bushel; (4) Contract No. 0091, dated May 17, 1995, was for 5,000 bushels of corn with an "arrival period" of December 95 at Lake Mills, Iowa, with a "futures option" of December 1995, at a "futures option price" of $2.68 per bushel; (5) Contract No. 0372, dated June 28, 1995, was for 5,000 bushels of corn with an "arrival period" of December 1995 at Lake Mills, Iowa, with a "futures option" of December 1995, at a "futures option price" of $2.75 per bushel.

Although none of the HTAs provides for "rolling," each was in fact "rolled," that is, delivery was postponed to a later date. The parties do not dispute that Schewe attempted to deliver his corn pursuant to the HTAs in the Fall of 1995, but that the elevator was full. However, they dispute whether, in these circumstances, Schewe or Top of Iowa requested or required that the HTAs be rolled to the Spring of 1996. Certainly, each of the contracts indicates that it was rolled to a later delivery date in the Spring of 1996 and each was repriced accordingly. However, Schewe canceled the contracts on May 31, 1996, asserting that Top of Iowa had breach-

ed the agreements by changing the terms of the roll. No grain was ever delivered on any of the contracts. This litigation followed Schewe's cancellation of the contracts.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of recent decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Center*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
> (b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.
>
> (c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b) & (c) (emphasis added).[1] Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to

determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394.

Furthermore, in *Coonley v. Fortis Benefit Ins. Co.*, 956 F.Supp. 841 (N.D.Iowa 1997), aff'd, 128 F.3d 675 (8th Cir.1997), this court recognized that primarily legal issues generally, and contract interpretation questions specifically, are issues amenable to summary disposition. *Coonley*, 956 F.Supp. at 844; accord *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995) (in an ERISA plan interpretation case, the court observed, "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate," citing *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir.1990)); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564–65 (7th Cir.1995) ("Summary judgment is particularly appropriate in cases involving the interpretation of contracts."); *Mumford v. Godfried*, 52 F.3d 756, 759 (8th Cir.1995) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); *McPeek v. Beatrice Co.*, 936 F.Supp. 618, 626 (N.D.Iowa 1996) (ERISA contract interpretation case before the court on summary judgment which quotes *Murphy*, 61 F.3d at 564–65). Similarly, this court has also concluded that statutory interpretation—particularly interpretation of the effect of a statute where

---

1. Neither party has moved for summary judgment on one of its own claims; thus, Rule 56(a), which governs summary judgment for a claim-

ant, is not applicable here, even though the matter is before the court on cross-motions for partial summary judgment.

facts are undisputed—is primarily a legal question amenable to summary judgment. *See Prudential Ins. Co. of Am. v. Rand & Reed Powers Partnership,* 972 F.Supp. 1194, 1202–03 (N.D.Iowa 1997), *aff'd,* 141 F.3d 834 (8th Cir.1998); *accord United States v. Carr,* 66 F.3d 981, 983 (8th Cir.1995) (statutory interpretation is a question of law reviewed *de novo*); *United States v. Moore,* 38 F.3d 977, 979 (8th Cir.1994) (the task of statutory interpretation "is one best placed in the hands of the trial judge," because it is a question of law); *United States v. Brummels,* 15 F.3d 769, 771 (8th Cir.1994) (explaining that, while findings of fact are reviewed for clear error, "[a]s to application of facts to the legal interpretation of [a statute], the standard of review is *de novo*"). Thus, because some of the issues before the court are essentially legal—contract and statutory interpretation—summary disposition may be particularly appropriate. *See Coonley,* 956 F.Supp. at 845.

With these standards in mind, the court turns to consideration of the parties' cross-motions for partial summary judgment on various claims and defenses.

### B. The Securities Exchange Act Claim

Top of Iowa has moved for summary judgment, first, on Schewe's counterclaim that the HTAs are securities sold in violation of the SEA. In arguing the question of whether or not the HTAs are "securities" within the meaning of the SEA, the parties both apply the three-part test established by the United States Supreme Court over fifty years ago in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). However, they reach very different conclusions on each prong of the test.

#### 1. The Howey test

This court considered what "investment contracts" are "securities" within the meaning of the SEA in *De Wit v. Firstar Corp.,* 879 F.Supp. 947 (N.D.Iowa 1995), a case involving cattle contracts rather than grain contracts:

> The threshold question presented by any claim of violation of securities laws is "whether what the plaintiffs invested in

was actually a 'security.'" *Stone v. Kirk,* 8 F.3d 1079, 1084 (6th Cir.1993) (citing *Union Planters Nat'l Bank of Memphis v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1179 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) ("The threshold question in any action brought pursuant to the Securities Acts is whether a security exists.")); *Koch v. Hankins,* 928 F.2d 1471, 1475 (9th Cir. 1991) ("critical threshold inquiry" was whether investments were "investment contracts" within meaning of Act and therefore subject to securities regulation). . . .

Almost fifty years ago, the United States Supreme Court established the test of what investment vehicles fall within the definition of an "investment contract" as a security subject to regulation under federal securities regulations in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). *Teague [v. Bakker],* 35 F.3d [978,] 986 [ (4th Cir.1994), *cert. denied,* 513 U.S. 1153, 115 S.Ct. 1107, 130 L.Ed.2d 1073 (1995)]; *[SEC v.] Eurobond Exchange, Ltd.,* 13 F.3d [1334,] 1338 [ (9th Cir.1994) ]; *Stone,* 8 F.3d at 1085; *Holden [v. Hagopian],* 978 F.2d [1115,] 1118 [ (9th Cir.1992) ]. Under the *Howey* test, an investment contract security exists if the contract involves (1) an investment of money (2) in a common enterprise (3) with an expectation of profits garnered "solely" from the efforts of others. *Howey,* 328 U.S. at 298–99, 66 S.Ct. at 1102–03 (an "investment contract" includes any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party"); *Teague,* 35 F.3d at 986; *Revak v. SEC Realty Corp.,* 18 F.3d 81, 87 (2d Cir.1994); *Eurobond Exchange,* 13 F.3d at 1338; *Stone,* 8 F.3d at 1085; *RTC [v. Stone],* 998 F.2d [1534,] 1540 [ (10th Cir.1993) ]. The test is a flexible one, "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103; *Stone,* 8

F.3d at 1085 (quoting *Howey*); *Securities and Exchange Comm'n v. R.G. Reynolds Enter., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991). Furthermore, in defining securities, substance governs form, and the substance of an investment contract is a security-like interest in a "common enterprise" that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either for direct distribution or as an increase in the value of the investment. *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–03; *United Housing Found. v. Forman*, 421 U.S. 837, 852–53, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir.1993) (holding that land sales contracts were not securities, because they involved no investment in an enterprise, even if land was bought on expectation that development of the area would increase the value of the land).

*De Wit*, 879 F.Supp. at 977–78; *accord Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144, 150–51 (3d Cir.1997) (noting that "[t]he *Howey* test still predominates in investment contract analysis today"); *SEC v. Life Partners, Inc.*, 102 F.3d 587, 588–89 (D.C.Cir.1996) (in the opinion on petition for rehearing, the court reiterated, "In order to qualify as a security, an investment must have been made in an enterprise the profits of which are derived from the efforts of others," citing *Howey*); *Allen v. Lloyd's of London*, 94 F.3d 923, 931 (4th Cir.1996) ("To determine whether Lloyd's Plan constitutes an 'investment contract' subject to the requirements of the securities laws, we apply the test announced in [*Howey*]."); *SEC v. Life Partners, Inc.*, 87 F.3d 536, 540 (D.C.Cir.1996) (in the first panel opinion, the court also analyzed whether investment contracts were securities within the meaning of the SEA using the *Howey* test).

### 2. Application of the Howey test to Schewe's HTAs

■ Courts rarely tarry over the "investment of money" prong of the Howey test, *De Wit*, 879 F.Supp. at 978, but in this case, it is a contentious issue. Top of Iowa contends that Schewe invested nothing; instead, he offered a commodity for sale to the elevator.

Schewe argues that it is not necessary that there be any placing of capital or laying out of money, but merely an expenditure to acquire property or other assets in order to produce revenue. He argues that he invested substantial sums of money in facilities, equipment, services, and inputs in order to arrive at the productive capacity that is required to be a successful farmer, and he made a substantial commitment of resources to the HTA program that could have been used elsewhere. He asserts further that the HTA program was an investment whereby he would increase his profits over what he could have earned by placing his grain in the market at the time of harvest.

Schewe's arguments, while imaginative, are simply unpersuasive, because they amount to nothing more than assertions that he did what farmers do to produce and sell grain and that he chose one marketing tool over another. Commitment of part of next year's crop to a certain market simply is not the same as investing money in some enterprise. Schewe certainly never placed money in the hands of a "promoter" with the expectation that his investment would grow. Rather, he retained for his own use all of the facilities, equipment, services, and inputs he asserts were required in order to arrive at the productive capacity necessary to be a successful farmer. Thus, Schewe has made no "investment of money" within the meaning of the first prong of the *Howey* test. *Howey*, 328 U.S. at 298–99, 66 S.Ct. 1100.

Top of Iowa also argues that the HTAs do not fit the second prong of the *Howey* test, because they were not an investment in any "common enterprise," but a vehicle to sell Schewe's own grain. Indeed, Top of Iowa argues that the HTAs were designed to avoid profits and losses associated with the volatility in the grain market, and hence there are no profits or losses of others to which the producer's fortunes were tied. Furthermore, Top of Iowa argues that Schewe did not have an undivided interest in anything beyond his own grain contracts, and thus could not expect any pro rata share of profits from some pooled investments. Nothing daunted, Schewe argues that the HTA program had both horizontal and vertical commonality.

Although his vertical commonality argument is vague at best, it seems to consist of the assertion that investors and promoters, presumably grain producers and elevators, respectively, had their fortunes tied together, because neither party intended that the purchasers would ever receive the grain, but instead intended both parties to profit from hedging against the market. His horizontal commonality argument is plainer: he contends that various farmers' grain was pooled and sold as a block on the Chicago Board of Trade and the farmers then received a pro rata share of the profits.

■ Again, neither Schewe's vertical commonality argument nor his horizontal commonality argument is persuasive. There is still no decision of the Eighth Circuit Court of Appeals resolving the question of whether the "common enterprise" prong of *Howey* requires only horizontal commonality, vertical commonality, or both. *Compare De Wit*, 879 F.Supp. at 978; *see also Steinhardt Group, Inc.*, 126 F.3d at 151 (noting that the Third Circuit Court of Appeals has required horizontal commonality). Thus, this court will examine Schewe's HTA contracts for either kind of commonality. "As a general guide, 'vertical commonality' requires only a pooling of the interests of the developer or promoter and each individual investor, while 'horizontal commonality' requires as well a pooling of interests among the investors, described by the court in *Wals* as 'a wheel and not just a hub and a spoke.'" *Id.* (citing *Wals v. Fox Hills Development Corp.*, 24 F.3d 1016, 1017–18 (7th Cir.1994)); *accord Steinhardt Group, Inc.*, 126 F.3d at 151 (" '[H]orizontal commonality requires a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors,' " quoting Maura K. Monaghan, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 FORDHAM L. REV. 2135, 2152–53 (May, 1995)); *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir.1995) (also citing *Wals* for the explanations of vertical and horizontal commonality).

■ The first fundamental difficulty with Schewe's assertion that the second prong of the *Howey* test is met is the fact that "it is not obvious that there is an 'enterprise' in the picture," which bleeds over into the third prong of the analysis, whether profit was expected to arise from the efforts of others. *See Life Partners, Inc.*, 87 F.3d at 545. However, just as devastating to Schewe's argument is the fact that there simply is no pooling of any investment, either between Schewe and Top of Iowa or between Schewe and any other farmers, in his HTA contracts. Thus the contracts lack either vertical or horizontal commonality. As to vertical commonality, Schewe's profits or losses on his HTAs were not in any way linked to the *efforts* of Top of Iowa. *See De Wit*, 879 F.Supp. at 979 (noting that this is a requirement of "broad" vertical commonality, citing *Revak*, 18 F.3d at 88). Rather, his profits or losses were based on his decision to deliver on the HTAs at a date within the designated "arrival period" and the price he would then obtain *vis-à-vis* his basis and production costs. Nor were Schewe's profits or losses on his HTAs linked to the *fortunes* of Top of Iowa. *Id.* (noting that this is a requirement of "strict" vertical commonality, also citing *Revak*, 18 F.3d at 88). Because Schewe had fixed the option price for the sale of grain under his HTAs, and hence could control his profits and losses, the fortunes of Top of Iowa in being compelled to buy the corn at the designated time and upon reselling the grain were entirely independent of Schewe's.

■ Schewe also cannot demonstrate any "horizontal commonality." *Id.* 879 F.Supp. at 980. To paraphrase this court's holding in *De Wit* for present circumstances, like the condominium contracts discussed in *Teague*, 35 F.3d at 986, each producer owns specific grain rather than an undivided share of all of the grain Top of Iowa might purchase subject to HTAs. The nature of the producer's interest thus is different from that of a shareholder in a corporation that owns any particular assets. There is no pooling of assets, as each producer's commitment is her or his own grain, and there is no pro-rata distribution of profits from resale of that grain. Rather, each producer's profit depends only on the performance of the producer's own grain and the timing of the producer's decision to deliver on the contract.

*Compare De Wit,* 879 F.Supp. at 980. Schewe has failed to distinguish *De Wit* in any meaningful way, because his assertion that various farmers' grain was pooled for sale on the Chicago Board of Trade is just as unpersuasive as the argument in *De Wit* that separately owned cattle were "pooled" into lots for sale, when each investor in that case still owned identifiable head of cattle and received only the profits from the sale of those head of cattle. *Id.* Here, each farmer received only the proceeds of sale of his own grain to Top of Iowa. Indeed, whatever happened to the grain after it was sold to Top of Iowa, whether or not it was then "pooled" and sold on the Chicago Board of Trade, was irrelevant to the individual producer's interest in and return on his own HTA, which was fully performed upon delivery of the grain to Top of Iowa.

■ Finally, as Schewe's own arguments concerning his "investment" make clear, he did not expect profits derived "solely" from the efforts of others, the third prong of the *Howey* test. *Howey,* 328 U.S. at 298–99, 66 S.Ct. 1100. Rather, he expected profits from his own diligence in producing grain economically and efficiently and from his own timing of the delivery of his grain for the optimal advantage of futures option price, basis, and production costs. In short, there is no discernable "enterprise" in which Schewe invested by means of the HTAs and from which he expected profits from the "efforts of others." *Id.; see also Life Partners, Inc.,* 87 F.3d at 545 (considering whether there was any "enterprise" in which the purported investors invested). The HTAs were not investments in an enterprise, but a means to market the products of Schewe's own enterprise, which was grain production, and he controlled that enterprise, others did not.

■ Thus, the court concludes that, as a matter of law, Schewe's HTAs were not "investment contract" securities, because they fail each of the prongs of the *Howey* test. Because there are no "securities" at issue, Schewe has failed to establish the threshold requirement of his SEA claim. *De Wit,* 879 F.Supp. at 977 (citing *Stone,* 8 F.3d at 1084). Therefore, Top of Iowa is entitled to sum-

mary judgment on Schewe's SEA claim in Count I of his counterclaim.

### C. The Commodities Exchange Act Claim

As the court observed at the outset, one of the key questions in this and many other cases involving HTAs is whether the specific HTAs in question are illegal off-exchange "futures" contracts under the Commodities Exchange Act (CEA), 7 U.S.C. §§ 1–25, or valid "cash forward" contracts not within the regulatory purview of the CEA. In Count II of his counterclaim, on which Top of Iowa seeks summary judgment, Schewe alleges that the HTAs he entered into are illegal off-exchange futures contracts, and hence are unenforceable. Top of Iowa, however, contends that Schewe's HTAs are instead valid cash forward contracts.

■ In *Oeltjenbrun,* this court recently discussed in some detail the differences between "futures" contracts and "cash forward" contracts as well as the tests courts use to distinguish between them. *See Oeltjenbrun,* 3 F.Supp.2d 1024, 1033–37. Therefore, rather than repeat that discussion, the court will pass on here to the question of whether Schewe's HTAs fall into one category or the other. However, it bears repeating that, in determining whether a contract is a futures contract or a cash forward contract, courts have cautioned that " '[s]elf-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts subject to the CEA].' " *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 773 (9th Cir.1995) (quoting *CFTC v. American Metal Exch. Corp.,* 693 F.Supp. 168, 192 (D.N.J.1988), in turn quoting *CFTC v. Morgan, Harris & Scott Ltd.,* 484 F.Supp. 669, 675 (S.D.N.Y.1979)), *cert. denied sub nom. Schulze v. Commodity Futures Trading Comm'n,* —— U.S. ——, 117 S.Ct. 64, 136 L.Ed.2d 26 (1996). As the Ninth Circuit Court of Appeals observed some years ago, in determining whether a contract for sale of a commodity is a futures contract or a cash forward contract, "no bright-line definition or list of characterizing elements is determina-

tive. The transaction must be viewed as a whole with a critical eye toward its underlying purpose." *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 581 (9th Cir.1982).

### 1. Schewe's HTAs

■■■■ The parties have recognized that the HTAs Schewe entered into with Top of Iowa are identical or virtually identical in their terms to those described in *Oeltjenbrun* as having been entered into originally between Oeltjenbrun and Farmers Cooperative Company (FCC).[2] *See Oeltjenbrun,* 3 F.Supp.2d 1024, 1044–47 In *Oeltjenbrun,* this court noted that the focus of judicial determinations of whether or not a contract is a valid cash forward contract was whether there was any obligation to make actual physical delivery of the commodity in question, *see Oeltjenbrun,* 3 F.Supp.2d at 1045 (citing *Noble Metals Int'l, Inc.,* 67 F.3d at 773; *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 971 (4th Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994); *In re Bybee,* 945 F.2d 309, 313 (9th Cir.1991); and *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578), and that such an obligation under the original FCC contracts, and hence under the Top of Iowa HTAs at issue here, was at best implied. *See id.* Again, the plain language of the contracts only "confirms" that the "Buyer," in this case, Top of Iowa, has made a futures transaction on behalf of the "Seller," here Schewe, *see, e.g.,* Complaint Ex. A (Contract No. 0020, dated March 13, 1995, ¶ 2), but it does not clearly impose a duty on Schewe to deliver any grain. At best, an inference of delivery arises from the statement that the transaction concerns a specified quantity of grain of a specified condition with a specified "Arrival Period," "Destination," and "Futures Option Price." *Id.* (table). Indeed, the only place that delivery is mentioned at all in the Top of Iowa HTAs is in the final paragraph, which states, "This is NOT considered a credit sale contract as long as final price is determined before deliv-

ery." *See, e.g.,* Complaint Ex. A at ¶ 9. That paragraph also provides one of the few inklings that an actual sale of grain—not simply an agreement that one party will make a futures transaction for the other on the CBOT—might be the underlying purpose of the contract. Another hint is the reference in the penultimate paragraph that upon failure to perform the HTA, the "Seller shall be subject to all of the terms of the 'Grain Purchase Contract and Confirmation' attached to and made a part of this contract." *Id.* at ¶ 8.

Nonetheless, in *Oeltjenbrun,* this court found that it was "clear that Oeltjenbrun understood similar contracts to require actual physical delivery of corn, because he performed" such a contract on a roll by actually delivering corn to the elevator. *Oeltjenbrun,* 3 F.Supp.2d at 1046 Furthermore, in concluding that the FCC contracts were cash forward contracts, this court reasoned as follows:

> [T]he contract is between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain and involves individually negotiated terms of amount, price, and delivery date. *Salomon Forex, Inc.,* 8 F.3d at 971 ("cash forwards are generally individually negotiated sales of commodities between principals"). Also, because the contract is between a grain producer and a grain elevator, the contract was entered into between parties able to make and receive physical delivery of the subject goods. *Id.* The grain contract has "inherent value" to each of the parties: to Oeltjenbrun because it provides for sale of a portion of his annual crop, and to the elevator because it provides the source of a supply of grain for the elevator's business. *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578 (examining the "inherent value" of the contract to the parties). Yet

2. Indeed, the only difference appears to be in the tabular portion of paragraph 2, which in the case of the FCC contracts included QUANTITY, BUSHELS, GRADE & GRAIN, ARRIVAL PERIOD, DESTINATION, QUALITY, FUTURES OPTION, and FUTURES OPTION PRICE, while in the Top of Iowa contracts, the table includes instead GRADE & GRAIN, ARRIVAL PERIOD, DESTINATION, QUANTITY, FUTURES OPTION, and FUTURES OPTION PRICE, but leaves out BUSHELS and QUALITY, two categories that were redundant of QUANTITY and GRADE & GRAIN.

more importantly, nowhere in this record does Oeltjenbrun maintain that he did not intend to deliver on the FCC HTAs; thus, he cannot generate a genuine issue of material fact that he had no such intent or that actual delivery was not the purpose of the contract, however inartfully the contract was drafted. FED. R. CIV. P. 56(e) (the nonmovant is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach,* 49 F.3d at 1325.

*Oeltjenbrun,* 3 F.Supp.2d at 1046

Here, as in *Oeltjenbrun,* it is "clear that [Schewe] understood similar contracts to require actual physical delivery of corn." *Oeltjenbrun,* 3 F.Supp.2d at 1046. Although Schewe never made actual physical delivery of corn on any similar contract, as did the producer in *Oeltjenbrun, see id.,* he nevertheless stated repeatedly that his intention was to make actual physical delivery of corn on *these* HTAs, at least up until May of 1996. *See* Defendant's Statement of Disputed Facts, ¶ 2 ("Schewe intended to deliver 30,-000 bushels of grain to Top of Iowa in the Fall of 1995. Top of Iowa refused to accept delivery of the grain. *See* ¶ 2, Schewe Aff. Mr. Schewe intended to deliver his grain but was not *required* to do so."), ¶ 7 ("Schewe intended to deliver 30,000 bushels of grain," but "[d]elivery, however, was not required under the contracts"), ¶ 8 ("Schewe requested that Top of Iowa provide adequate assurance of delivery. Top of Iowa refused and repudiated the contracts. *See* Exhibits A and B to Schewe Aff. Schewe did not repudiate the contracts—Top of Iowa did."); Affidavit of Virgil Schewe In Opposition To Plaintiff's Motion For Partial Summary Judgment, ¶ 2 ("In 1995, I entered into five hedge-to-arrive contracts. I intended to deliver 30,000 bushels of grain in the Fall of 1995. Top of Iowa refused to accept delivery of my grain and forced me to roll my contracts forward to a later date."), Exhibit A (Letter from Schewe to Top of Iowa stating, "My original intention was to deliver the corn and fulfill the contracts in the fall of '95."), & Exhibit B (Letter of 5–31–96 from Schewe to Nesler stating, "The reason I entered these contracts was so I could deliver the corn last fall out of the field and not store it at home but you said I had to wait because you did not have room. Therefore, on your advice I rolled the contracts."). In May of 1996, Schewe did not state that he believed he had no obligation to deliver grain under the terms of the contract; rather, he asserted that he had been relieved of that obligation because of alleged breaches of the contracts by Top of Iowa. Affidavit of Virgil Schewe, Exhibit B ("Because of your actions and changing the terms, you have breached the agreements. Therefore, I am cancelling the contracts and will not make the deliveries."). Schewe therefore cannot generate a genuine issue of material fact that he never intended to deliver on the contracts and the parties' intention that delivery occur clarifies any uncertainty as to an actual delivery obligation under the ambiguous terms of the HTAs.

Furthermore, like the FCC contracts in *Oeltjenbrun,* Schewe's HTAs with Top of Iowa are between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain and each involves individually negotiated terms of amount, price, and delivery date. *Salomon Forex, Inc.,* 8 F.3d at 971 ("cash forwards are generally individually negotiated sales of commodities between principals"). Also, because the contract is between a grain producer and a grain elevator, the contract was entered into between parties able to make and receive physical delivery of the subject goods. *Id.* The grain contract has "inherent value" to each of the parties: to Schewe because it provides for sale of a portion of his annual crop, and to the elevator because it provides the source of a supply of grain for the elevator's business. *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578 (examining the "inherent value" of the contract to the par-

ties). Again, nowhere in this record does Schewe maintain that he did not intend to deliver on his HTAs; thus, he cannot generate a genuine issue of material fact that he had no such intent or that actual delivery was not the purpose of the contracts, however inartfully the contracts were drafted. FED. R. CIV. P. 56(e) (the nonmovant is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325.

Thus, the question becomes whether the "roll" of the contracts, even though there is no express "roll" provision in any of them, somehow makes them illegal off-exchange futures contracts. Because there is no express "roll" provision, either permitting, forbidding, or in any way contemplating rolling, these contracts, like the FCC contracts at issue in *Oeltjenbrun,* at best were "administered" in such a fashion that rolling was permitted. The rolling of Schewe's HTAs with Top of Iowa is similar to the "bookout" agreements the Ninth Circuit Court of Appeals found the CFTC countenanced in *In re Bybee,* 945 F.2d at 314. Like "bookout" agreements, the agreements to roll Schewe's contracts were separate, individually negotiated, new agreements, or were unilateral actions taken by Top of Iowa to move Schewe's delivery date to the Spring of 1996 when the elevator was full in the Fall of 1995; there was no obligation or arrangement to enter into rolls in the original contracts; the agreements to roll were not provided for by the terms of the contracts as initially entered into; and Top of Iowa was entitled to demand delivery, although it instead decided to roll the contracts, and Schewe was entitled to make delivery, pursuant to the terms of the original contract. *In re Bybee,* 945 F.2d at 314 (citing *Statutory Interpretation Concerning Forward Transactions,* 55 Fed. Reg. 39188, 39192 (Sept. 25, 1990), which

concluded that, for these reasons, "bookout" agreements did not negate the delivery requirement and did not change cash forward contracts into illegal futures contracts). Furthermore, the obligation to make actual delivery of corn in the Spring of 1996, after the rolls, remained just as real and binding as the delivery obligation was in the original contract, because rolling was not a matter of right by Schewe. Therefore, to this point in the court's analysis, the HTAs in question here are cash forward contracts.

### 2. Schewe's attempt to distinguish or dispute Oeltjenbrun

Schewe nonetheless argues that this court should reach a different conclusion as to his HTAs with Top of Iowa, either because of differences in his HTAs, or because this court was simply wrong in *Oeltjenbrun.* He points out that, unlike the FCC contracts in *Oeltjenbrun,* each of which was canceled when rolled and replaced with another HTA including slightly different terms in ¶ 5, *see Oeltjenbrun,* 3 F.Supp.2d at 1045, his original HTAs remained in force after they were rolled. He asserts that the difference in terms in the replacement FCC contracts in *Oeltjenbrun* was significant in the court's conclusion that those HTAs were cash forward contracts.

Paragraph 5 in the replacement HTAs in *Oeltjenbrun* stated the following:

> SELLER agrees to set the "Cash Basis" and determine the cash value of said grain on or before *11–30–96 and deliver no later than 11–30–96.* Unless other terms have been agreed upon by both Buyer and Seller prior to said date, and grain has not been priced by Seller, Buyer is authorized to set the cash basis and to set the cash price of contract.

*Oeltjenbrun,* 3 F.Supp.2d at 1045 (emphasis added). This court did observe that the change was "significant," because in the original HTAs in that case, the obligation to make actual physical delivery was at best implied. *Id.* Indeed, Schewe asserts that he is entitled to summary judgment in his favor to the effect that the contracts are illegal off-exchange futures contracts simply because,

like the HTAs originally entered into between Oeltjenbrun and FCC, his HTAs merely "confirm" a transaction on the Chicago Board of Trade.

However, contrary to Schewe's argument that the change in ¶ 5 of the FCC contracts in *Oeltjenbrun* was "crucial to the court's conclusion" that those contracts were cash forward contracts, Defendant's Reply Memorandum at 2, this court did not in fact rely on that change at all in reaching its conclusion that the parties intended actual physical delivery of grain. Rather, this court found no evidence that Oeltjenbrun had agreed to the change, and thus there was no inference from the changed terms of Oeltjenbrun's intent as to delivery under the contracts. *See Oeltjenbrun*, 3 F.Supp.2d at 1046 ("Although contracts made after each roll, with the exception of contract no. 281, FCC Ex. J, all add to ¶ 5 the language requiring that Oeltjenbrun 'deliver no later than' a specified date, *see* FCC Exs. G, H, I, and K, Oeltjenbrun did not sign any of the these contracts except contract no. 281. Thus, the court is loath to assume the addition of the 'deliver no later than' language is indicative of Oeltjenbrun's intent, even if it clarifies FCC's intent, where FCC is the only party to have signed the contract."). This court instead found that the evidence establishing beyond dispute that the parties to the FCC contracts intended actual physical delivery of the grain were the producer's actual delivery of grain on a similar contract and the fact that "nowhere in this record does Oeltjenbrun maintain that he did not intend to deliver on the FCC HTAs; thus, he cannot generate a genuine issue of material fact that he had no such intent or that actual delivery was not the purpose of the contract, however inartfully the contract was drafted." *Id.* Plainly, the change in the FCC contracts after the roll was *not* "crucial" to the court's determination that the FCC contracts were valid cash forward contracts.

Schewe audaciously asserts that "Top of Iowa and this Court continue to base their legal conclusions on the fact that HTA contracts were entered into between farmers and elevators. This approach, however, ignores the plain language of the contracts. Likewise, such a finding implies that while the rest of society has strict protection from securities and commodities fraud, farmers are excluded from these protections. The Court's ruling in Oeltjenbrun implies that all transactions made by farmers are excluded from regulation." Defendant's Reply Memorandum at 3. This, of course, is an attempt to oversimplify this court's ruling in *Oeltjenbrun* beyond all recognition.

Certainly, the court did base its ruling in *Oeltjenbrun* in part on the fact that the parties to the HTAs were farmers and grain elevators, producers and buyers of grain, respectively. *See Oeltjenbrun*, 3 F.Supp.2d at 1046. However, this fact is one of several factors that courts, including this one, consider in determining whether or not a contract is a valid cash forward contract. *See id.* (citing *Salomon Forex, Inc.*, 8 F.3d at 971). The fact that the contracts were between producers and buyers of the commodity in question also demonstrates the ability of the parties to make and receive physical delivery of the subject goods, another factor, *see id.* (also citing *Salomon Forex, Inc.*, 8 F.3d at 971), and the "inherent value" of the contracts to the parties, yet another factor. *See id.* (citing *Co Petro Mktg. Group, Inc.*, 680 F.2d at 578). Furthermore, the court heeded the warning of the Ninth Circuit Court of Appeals in *Co Petro* that "[t]he transaction must be viewed as a whole with a critical eye toward its underlying purpose." *Co Petro Mktg. Group, Inc.*, 680 F.2d at 581. Thus, any assertion that the court relied solely on the fact that the parties were a farmer and a producer, and that the court suggested that farmers are not entitled to the protections of the CEA, misconstrues the ruling in *Oeltjenbrun*.

█ Finally, Schewe directly attacks one of the court's conclusions in *Oeltjenbrun*, something he is entitled to do, if he can do so on factually or analytically sound grounds. He contends that the court's conclusion that a farmer has the ability to "make delivery" is "questionable," because "Top of Iowa and this Court have no way of knowing for sure whether Schewe would have the ability to produce corn in future crop years," as "any number of factors could have eliminated [a

farmer's] ability to make delivery." Defendant's Reply Memorandum at 3. Again, Schewe misconstrues the import of the "ability to deliver" factor in the "cash forward" contract analysis. The question is not whether the seller will be absolutely certain to deliver, but whether the parties are engaged in the business of producing or buying the commodity and whether, because they are engaged in that business, they would be likely to produce and deliver, on the one side, and to receive on the other, the actual commodity. *See Salomon Forex, Inc.*, 8 F.3d at 971; *see also Co Petro Mktg. Group, Inc.*, 680 F.2d at 578 (considering the "inherent value" of the contracts to persons actually engaged in the business of producing or buying and using the commodity). Indeed, even under an indisputably valid cash forward contract, the purpose of the contract is for a "farmer to sell part of next season's harvest at a set price to a grain elevator or miller," *Co Petro Mktg. Group, Inc.*, 680 F.2d at 577, *i.e.*, to sell grain before the farmer has actually grown it. In those circumstances, there is always the possibility that the farmer will be unable to deliver at the forward date, because of a crop failure or other intervening event. Absolute certainty of ability to perform in the future simply is not a requirement of a cash forward contract.

Thus, for many of the same reasons this court found in *Oeltjenbrun* that Oeltjenbrun's HTA contracts with FCC were valid "cash forward" contracts, the court concludes that Schewe's HTAs with Top of Iowa are "cash forward" contracts as a matter of law, and thus outside the purview of the CEA. Consequently, Top of Iowa is entitled to summary judgment on Count II of Schewe's Counterclaim, which alleges a violation of the CEA.

The court's rulings in Top of Iowa's favor on its motion for summary judgment on Counts I and II of Schewe's counterclaim necessarily also disposes of Top of Iowa's motion for summary judgment on Schewe's defense of illegal contracts, as well as the first part of Schewe's own motion for partial summary judgment, which sought judgment in his favor on the illegal contract defense. All that now remains is the second contention Schewe raises in his motion, which is his assertion that he is entitled to summary judgment dismissing Top of Iowa's cause of action for failure to state a claim upon which relief can be granted, because Top of Iowa is barred by the terms of the HTAs from recovering amounts allegedly paid in margin calls on the elevator's hedge transactions that relate to Schewe's HTAs. That portion of Schewe's motion for partial summary judgment is considered in the next section of this ruling.

### D. Inability To Recover Margin Calls

The entirety of Schewe's argument that he is entitled to summary judgment on Top of Iowa's claim for damages, because Top of Iowa is contractually barred from recovery, is as follows:

> The clear language of the contract states as follows: "Buyer shall be responsible for commissions and margin requirements of this transaction." *See* Exhibit A of Plaintiff's Petition. Plaintiff is now wrongfully requesting reimbursement of $65,400 that it has allegedly paid in margin calls. *See* ¶ 6 of Plaintiff's Petition. Such a position by Top of Iowa is in clear contradiction of the language within the four corners of the contract. The language of the contracts controls and Plaintiff's action should be dismissed.

Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment, p. 3. Top of Iowa's response, nearly as brief as Schewe's argument, is that Schewe has failed to understand its claim. Top of Iowa's cause of action, so it explains, is

> for the damages Top of Iowa suffered as a result of Schewe's failure to deliver grain as set out under the HTA contracts. Top of Iowa's damages happen to equal the margin calls Top of Iowa had to make on the hedge position taken with the Chicago Board of Trade. If Schewe would have delivered the corn, as required under the contracts, Top of Iowa would have received all of their [sic] margin calls back based upon the sale of corn at a higher price than what the corn was bought from Schewe for.
>
> Top of Iowa *was* responsible for the commissions and margin requirements that were required to be made based upon its

hedge position with [the] Chicago Board of Trade. However, these margin call amounts were the damages suffered by Top of Iowa as a result of Schewe's failure to deliver the corn under the HTA contracts.

Memorandum of Law in Support of Plaintiff's Resistance to Defendant's Motion for Summary Judgment, p. 8.

■■■■■ Upon proof of a breach of contract, under Iowa law—which is applicable to Top of Iowa's claim in this diversity action— the non-breaching party is entitled to damages " 'to place the injured party in the position he or she would have occupied if the contract had been performed.' " *Flom v. Stahly,* 569 N.W.2d 135, 142 (Iowa 1997) (quoting *Macal v. Stinson,* 468 N.W.2d 34, 36 (Iowa 1991); *Aurora Business Park Associates, L.P. v. Michael Albert, Inc.,* 548 N.W.2d 153, 157 (Iowa 1996) (also citing *Macal*)). Expenditures made by the plaintiff in reliance on contractual obligations are a proper measure of damages when the defendant has breached a contract, as are lost profits. *Yost v. City of Council Bluffs,* 471 N.W.2d 836, 840 (Iowa 1991).

The margin calls Top of Iowa seeks as damages were amounts Top of Iowa paid in reliance on Schewe's performing his contractual obligations, *Yost,* 471 N.W.2d at 840, and recovery of such damages would place Top of Iowa in the position it would have occupied had Schewe performed the contracts. *Flom,* 569 N.W.2d at 142; *Aurora Business Park Associates, L.P.,* 548 N.W.2d at 157. The contracts do not bar recovery of these amounts as damages for breach of contract, simply because they provide that, in the performance of the HTAs, "Buyer shall be responsible for commissions and margin requirements of this transaction." Complaint Exhibit A, ¶ 6. The second part of Schewe's motion for partial summary judgment is therefore groundless and must be denied.

### III. CONCLUSION

Once again, the court has answered one of the key questions in HTA cases by concluding that the particular HTAs at issue here are valid "cash forward" contracts not within the regulatory purview of the CEA, rather than illegal off-exchange "futures" contracts under the CEA. Furthermore, on the novel question of whether the HTAs are "securities" within the meaning of the SEA, the court concludes that the answer is no. The HTAs at issue here do not meet any of the three prongs of the *Howey* test of what is an "investment contract" security subject to regulation under federal securities laws. Finally, the court concludes that there is no contractual bar to the damages Top of Iowa seeks for Schewe's repudiation of the HTAs.

THEREFORE,

1. Top of Iowa's March 12, 1998, motion for partial summary judgment is granted in its entirety. Summary judgment is granted in favor of Top of Iowa on Counts I(SEA) and II(CEA) of Schewe's counterclaim and those claims are consequently **dismissed.** Summary judgment is also granted in Top of Iowa's favor on Schewe's affirmative defense no. 20, which asserts the illegality of the contracts at issue, and that defense is consequently **stricken.**

2. Schewe's April 23, 1998, motion for partial summary judgment is denied in its entirety.

**IT IS SO ORDERED.**