Thomas REVAK, Diane M. Revak, Gary Hale, Sharon Hale, Irwin L. Allman, Allison Allman, John Pierri, Jr., Douglas E. Turk, Judith S. Turk, Roger Brownlow, Doris Brownlow, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

SEC REALTY CORP., W. Criswell Freeman, L.H. Hardwick, III, Stephen C. Baker, L.E. Bryan, Jr., John B. Bearden, McCoy C. Zachry, Gloria F. Pope, Dearborn & Ewing, Esqs., Sovran Bank, Boatmen's Bank of Tennessee, and John Doe or John Doe, Inc., being fictitious individual and/or corporate entities and being assignees and holders of promissory notes, mortgages, and/or deeds of trust given by plaintiffs or other members of the class to finance the purchase of Lake Park Condominiums from SEC Realty Corp., Defendants–Appellees.

No. 548, Docket 93–7577.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1993.

Decided Feb. 23, 1994.

Kenneth A. Payment, Rochester, NY (A. Paul Britton, Harter, Secrest & Emery, Rochester, NY, of counsel), for plaintiffs-appellants.

Glenn T. Marrow, Rochester, NY (David L. Hoffberg, Nixon, Hargrave, Devans & Doyle, Rochester, NY, of counsel), for defendants-appellees Stephen C. Baker and Dearborn & Ewing.

Roy Z. Rotenberg, Rochester, NY (Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, of counsel), for defendant-appellee Boatmen's Bank of Tennessee.

Before: McLAUGHLIN, JACOBS, and REAVLEY *, Circuit Judges.

* The Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth Circuit, sitting by designation.

JACOBS, Circuit Judge:

New York investors who purchased condominium apartments in a Chattanooga, Tennessee housing development brought this putative class action against the real estate promoter, SEC Real Estate Corp., and its legal counsel in the transaction, alleging that nondisclosure of a gas well on the property and discrepancies in the closing documents constitute federal securities fraud, common law fraud (or, in the alternative, negligent misrepresentation) and racketeering. In addition, the purchasers seek rescission of the purchase-money notes and the deeds of trust on the ground that fraud in the factum defeats the rights of defendants-appellees Boatmen's Bank and Sovran Bank as holders in due course.

The purchasers appeal from a series of summary judgment orders of the United States District Court for the Western District of New York (Telesca, J.), dismissing piecemeal all the claims for relief. Claims asserted under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2), were dismissed on statute of limitations grounds. Claims asserted under § 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), as to which the statute of limitations defense was not pleaded, were dismissed on substantive grounds: the § 10(b) claim relating to non-disclosure of the gas well was dismissed (along with the common law and racketeering claims premised on the same non-disclosure) on the ground that title was marketable; the § 10(b) claim relating to discrepancies in the closing documents was dismissed (along with the related common law and racketeering claims) because the discrepancies had not caused the purchasers any loss. The claim for rescission against the holders in due course was dismissed on the ground that the alleged misconduct, if fraudulent, was not fraud in the factum.

We affirm the judgment of the district court. However, we do so on different grounds as to some claims, chiefly because we hold that the condominium purchase con-

tracts are not investment contracts, and therefore are not "securities" under the federal securities laws.

## BACKGROUND

■ In ruling on a motion for summary judgment, the evidence of the party against whom summary judgment has been entered is to be believed. *See Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992). We therefore recount the version of events sponsored by plaintiffs-appellants where factual issues are in dispute.

This controversy arises from the conversion of a 484–unit apartment complex in Chattanooga, Tennessee into a condominium project called Lake Park Condominiums ("Lake Park"). The Lake Park units were marketed primarily to New York investors. Defendant-appellee SEC Real Estate Corp. ("SEC Realty") was the owner of the complex and the promoter of the condominium project.

In 1985, SEC Realty retained the Nashville law firm of Dearborn & Ewing ("D & E") to prepare the Lake Park Offering Plan. The D & E partner in charge of the representation was Stephen Baker, a member of the board of directors of SEC Realty. D & E and Baker, who are defendants-appellees on this appeal, prepared the Offering Plan and, as required by New York's Martin Act, N.Y.Gen.Bus. Law art. 23–A, filed it with the New York State Department of Law.

Marketing of the Lake Park units began in July 1986. SEC Realty encouraged prospective investors to consider the tax shelter advantages of the units, the income to be derived from rentals, and the prospect of capital appreciation upon resale. To minimize the initial cash requirement, SEC Realty offered to furnish up to 99% financing. All buyers were also offered the opportunity to enter into an on-site management contract with the Nashville management firm of Harvey Freeman & Sons, Inc., for such services as advertising, leasing, lease renewal, interior maintenance, and rent drop.

Most of the Lake Park units were ultimately purchased by New York residents.

The individual plaintiffs-appellants belong to the group of New York purchasers; they unsuccessfully sought class certification to represent the interests of approximately 100 other New York investors who purchased Lake Park condominiums.

In the condominium transactions, the buyers gave SEC Realty adjustable-rate promissory notes and deeds of trust, which were subsequently assigned to defendants-appellees Boatmen's Bank and Sovran Bank (the "Banks"). It is undisputed that the Banks are holders in due course of these deeds and notes.

By December 1989, it became clear that the tax advantages and capital gains forecast by SEC Realty would not soon materialize. Thereafter, plaintiffs discovered allegedly false representations in the Lake Park Offering Plan. These consisted of (i) the failure to disclose the existence of a gas well on the Lake Park property, and (ii) discrepancies between the sample debt instruments contained in the Offering Plan and the actual debt instruments presented to plaintiffs (and signed by them) at their respective closings.

### A. The Gas Well

Some or all of the Lake Park site became subject to an oil and gas lease executed in January, 1954. The lease, known as the Bunch/Perkins lease, had an initial term of ten years and continued indefinitely "as long thereafter as oil, gas or other mineral is produced from" the land. A gas well was drilled on the Lake Park property in 1972. Although the well was later designated as "dry and abandoned", it was not plugged until 1989.

The Offering Plan provided a detailed description of the Lake Park units and explicitly stated that any conveyance of title would be subject to:

> Lease of oil and gas and other minerals as set forth in instrument of record in Book 1129, page 256, Register's Office for Hamilton County, Tennessee.

The Offering Plan made no mention of the gas well drilled in 1972. However, the location of this well was on file in the Hamilton County Register's Office.

SEC Realty contracted to "convey or cause to be conveyed to Buyer good, marketable, fee simple title to the Unit." Since the title insurance policy provided to purchasers listed a number of exceptions, including the oil and gas lease, and since the Offering Plan pointed purchasers to the registry book (and the page) recording the lease terms, plaintiffs do not allege non-disclosure of the lease itself. . Rather, plaintiffs complain of the failure to disclose the existence of the gas well. The well allegedly placed a cloud on title because (i) it was theoretically capable of further production, thus causing confusion as to the viability of the Bunch/Perkins lease, and (ii) an unexpired mineral lease raises vexed questions under Tennessee law concerning the separation of titles to surface and mineral rights. In sum, there was arguably a cloud on title when the units were sold, and it continued to affect marketability, at least until the well was plugged in 1989.

## B. Alterations to the Debt Instruments

When SEC Realty began marketing the Lake Park units, it gave each potential investor a copy of the Offering Plan. It included a "Certification of the Sponsor and the Sponsor's Principals", signed by Baker, which represented that the Offering Plan did not "omit any material fact" or "contain any untrue statement of a material fact". The Offering Plan also contained sample forms of the adjustable rate promissory note and the deed of trust that SEC Realty would require the purchasers to execute at the title closing. It is undisputed that the actual promissory note and the deed of trust presented to plaintiffs at closing differed from the forms in the Offering Plan in the following respects.

The specimen deed of trust in the Offering Plan provided in Paragraph 19 (headed "Acceleration; Remedies") that the buyer would be given notice of default and allowed at least ten days from the date of that notice to cure the default before the lender could accelerate and foreclose on the property. Paragraph 20 of the specimen deed of trust in the Offering Plan provided:

20. **Lender in Possession.** Upon acceleration under Paragraph 19 or abandonment of the property, Lender . . . shall be entitled to enter upon, take possession of and manage the property and to collect the rents of the property including those past due.

The deed of trust presented to plaintiffs at closing, and signed by them, allowed the lender to take over the unit without affording the investors notice of default and an opportunity to cure:

20. **Lender in Possession.** *Following borrower's default in the payment of any sum secured by the Security Instrument for a period in excess of ten (10) days,* Lender . . . shall be entitled to enter upon, take possession of and manage the property and to collect the rents of the property including those past due.

Neither SEC Realty nor its lawyers informed the purchasers that the Lender in Possession clause had been changed in this way. Although all of the closings occurred between June, 1986 and November, 1987, plaintiffs state that they did not become aware of the change in the Lender in Possession clause until they looked at their closing papers in May, 1991.

The adjustable-rate note signed at the closings also differed from the specimen document filed with the Offering Plan. The specimen stated:

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the note holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least **30 days** after the date on which the notice is mailed to me or if it is not mailed, **30 days** after the date on which it is delivered to me.

In the closing documents, however, the 30 day notice of default had been curtailed to a 10 day notice period. Plaintiffs allegedly did not discover this change until December, 1991.

Plaintiffs' failure to detect the changes in the debt instruments is no doubt due in part to the plaintiffs' decision not to retain counsel for the closings. No counsel was needed,

plaintiffs believed, because the Offering Plan recited that it did not "omit any material fact" or "contain any untrue statement of a material fact", and was approved by the New York State Department of Law. Nevertheless, the Offering Plan clearly warned prospective buyers that

THE PURCHASE OF A CONDOMINIUM UNIT HAS MANY SIGNIFICANT LEGAL AND FINANCIAL CONSEQUENCES. THE ATTORNEY GENERAL STRONGLY URGES YOU TO READ THIS OFFERING PLAN CAREFULLY AND TO CONSULT WITH AN ATTORNEY BEFORE SIGNING A PURCHASE AGREEMENT

In addition, the purchase agreement contained in the Offering Plan revealed the following:

16. *Seller's Attorney.* Buyer acknowledges that Seller's attorneys are representing only Seller in this transaction.

### C. Procedural Events

Plaintiffs commenced this action on December 22, 1989. The second amended class action complaint alleges that the failure by SEC Realty, D & E, and Baker (the "SEC Realty defendants") to disclose material information in the Offering Plan constitutes (i) a violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), (ii) a violation of § 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), (iii) common law fraud or, alternatively, negligent misrepresentation, and (iv) a violation of the Racketeer and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"). Accordingly, plaintiffs seek an order of judgment rescinding the debt instruments. Plaintiffs also seek rescission on the ground that the debt instruments now held by the Banks were procured by fraud in the factum.

The district court issued three separate decisions that, together, dismissed all of the plaintiffs' claims. First, on April 30, 1991, Judge Telesca determined that the sale of Lake Park condominiums constituted the sale of "securities" for purposes of the federal securities laws. On March 11, 1992, the district court (i) dismissed any and all claims arising from the gas well located on the Lake

Park property because the well did not render title unmarketable; (ii) dismissed, for lack of loss causation, the remaining claims asserted under § 10(b), common law, and RICO; and (iii) noted that the complaint against Baker and D & E (who together prepared the Offering Plan) was not filed until February 13, 1990, and thereby dismissed all § 12(2) claims arising before February 13, 1987 as time barred under the three year statute of limitations provided for in the Securities Act of 1933, 15 U.S.C. § 77m. The March 11 decision eliminated all claims except those under § 12(2) asserted by the handful of plaintiffs who closed on their condominiums on or after February 13, 1987. Finally, on May 10, 1993, Judge Telesca (i) dismissed the § 12(2) claims of these remaining plaintiffs under the one year statute of limitations triggered by constructive notice, and (ii) ruled that the notes held by the Banks were not void for fraud in the factum.

### DISCUSSION

### I. THE SEC REALTY DEFENDANTS

We hold that the condominium transactions are not investment contracts, and therefore are not securities for purposes of the federal securities laws. Affirming the dismissal of the securities claims on that ground, we have no reason to consider the district court's rulings concerning expiration of the statute of limitations on the § 12(2) claims and the lack of loss causation under § 10(b). Since the Lake Park units are not securities, we affirm the dismissal of plaintiffs' RICO claims on the ground that there was no "racketeering activity". We also affirm the dismissal of all common law claims, because plaintiffs have suffered no injury caused by the alterations to the debt instruments, and the SEC Realty defendants had no duty to disclose the existence of the gas well.

### A. The Securities Claims

Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), defines a "security" as

any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certifi-

cate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

(Emphasis added.) If the Lake Park offering is to constitute the sale of a "security", it must fall within the definition of an investment contract. The district court found that it does; we disagree.

The Supreme Court long ago defined the term "investment contract" to include any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey, Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The investors in *Howey* bought parcels of land in a citrus grove. The land was offered together with a service contract under which the seller would jointly cultivate the groves and market the produce, and would remit the profits to investors based on the acreage they owned. The Court held that the transaction was an investment contract, emphasizing that the seller was offering "something more than fee simple interests in land, something different from a farm or orchard coupled with management services." *Id.* at 299, 66 S.Ct. at 1103. The "something more" was the opportunity to join in a "common enterprise"; investors would "contribute money and ... share in the profits of a large citrus fruit enterprise managed and partly owned" by the seller. *Id.*

■ The three elements of the *Howey* test must all be present for a land sale contract to constitute a security: (i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others. *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 192 (5th Cir.

1979). We hold that the Lake Park venture does not constitute a common enterprise.

■ A common enterprise within the meaning of *Howey* can be established by a showing of "horizontal commonality": the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits. *See Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir.1984); *Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 682 F.2d 459, 460 (3d Cir.1982) (investment must be "part of a pooled group of funds"); *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir.) (success or failure of other contracts must have a "direct impact on the profitability of plaintiffs' contract"), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). In a common enterprise marked by horizontal commonality, the fortunes of each investor depend upon the profitability of the enterprise as a whole:

> Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture. In fact, a finding of horizontal commonality requires a sharing or pooling of funds.

*Hart*, 735 F.2d at 1004 (citations omitted).

■ Some circuits hold that a common enterprise can also exist by virtue of "vertical commonality", which focuses on the relationship between the promoter and the body of investors. *See SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir.1974) ("requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy" of the promoter); *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir.1983), *aff'd en banc*, 730 F.2d 1403 (1984). In an enterprise marked by vertical commonality, the investors' fortunes need not rise and fall together; a pro-rata sharing of profits and losses is not required. Two distinct kinds of vertical commonality have been identified: "broad vertical commonality" and "strict vertical commonality". To establish

"broad vertical commonality", the fortunes of the investors need be linked only to the *efforts* of the promoter. *See Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 140–41 (5th Cir.1989). "Strict vertical commonality" requires that the fortunes of investors be tied to the *fortunes* of the promoter. *See Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir.1978).

This Court has not previously considered whether vertical commonality (strict or otherwise) satisfies the common enterprise requirement of the *Howey* test. There is nothing in the record to indicate that the fortunes of the Lake Park purchasers were interwoven with the promoter's fortunes so as to support a finding of strict vertical commonality. Accordingly, we need not address the question of whether *strict* vertical commonality gives rise to a common enterprise. We do consider whether *broad* vertical commonality satisfies *Howey*'s second requirement, and we hold that it does not.

In concluding that the sale of Lake Park units constituted the sale of securities, the district court evidently adopted the broad vertical commonality approach. A critical factor in the district court's analysis is that many of the plaintiffs enlisted the management services of Harvey Freeman & Sons, Inc. to oversee all rental arrangements. Such a service contract may tend to demonstrate that (at least some) investors expected profits to be derived from the efforts of others. The district court relied on the same arrangement to establish a common enterprise, as the broad vertical commonality analysis invites the finder of fact to do. We do not interpret the *Howey* test to be so easily satisfied. If a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by *Howey*—whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others—are effectively merged into a single inquiry: "whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 522 (5th Cir.1974). *See Savino v. E.F. Hutton &*

*Co., Inc.*, 507 F.Supp. 1225, 1237–38 n. 11 (S.D.N.Y.1981) (in dicta, broad vertical commonality is inconsistent with *Howey* ); *Berman v. Bache, Halsey, Stuart, Shields, Inc.*, 467 F.Supp. 311, 319 (S.D.Ohio 1979) ("a finding of a common enterprise based solely upon the fact of entrustment by a single principal of money to an agent effectively excises the common enterprise requirement of *Howey* ").

■ We next consider whether horizontal commonality exists among the Lake Park investors so as to satisfy *Howey's* common enterprise requirement. Plaintiffs do not allege, and the SEC Realty defendants vehemently deny, that any rent-pooling arrangement existed among the Lake Park investors. The rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner. Plaintiffs owned individual units, and could make profits or sustain losses independent of the fortunes of other purchasers. There are simply no indicia of horizontal commonality. The fact that many purchasers employed the services of Harvey Freeman & Sons, Inc. in renting their units establishes, at most, a common agency, not a common enterprise. *See Lavery v. Kearns*, 792 F.Supp. 847, 857–59 (D.Me.1992) (no horizontal commonality where unit owners executed separate contracts with a common marketing agent). Accordingly, the Lake Park venture does not constitute a common enterprise within the meaning of *Howey* and the sale of the Lake Park condominium units cannot be considered the sale of securities for purposes of the federal securities laws.

■ Our analysis is consistent with the approach adopted by the Securities and Exchange Commission (the "SEC") in applying the principles of *Howey* to condominium offers. The SEC recognizes that the sale of a condominium, without more, does not constitute a security transaction. SEC Release No. 33–5347, 38 Fed.Reg. 1735 (Jan. 18, 1973) (listed in 17 C.F.R. § 231.5347); *see also Dumbarton Condominium Ass'n v. 3120 R St. Associates*, 657 F.Supp. 226, 230 (D.D.C.1987) (sales of condominiums not investment contracts absent a collateral expectation of profits); *Bender v. Continental*

*Towers Ltd. Partnership,* 632 F.Supp. 497, 500 (S.D.N.Y.1986) (same); *Mosher v. Southridge Associates, Inc.,* 552 F.Supp. 1231, 1232 (W.D.Pa.1982) (same). A condominium offer is an investment contract only if it is accompanied by one or more of the following collateral agreements: (i) a rental arrangement coupled with a sales promotion emphasizing the economic benefits to be derived from renting out the condominium through the offices of the condominium management or their agents; (ii) a rental pool arrangement; or (iii) material restrictions on the owner's occupancy or rental of the unit, such as requiring that the unit be available for rental for part of the year, or that the owner use an exclusive rental agent. 38 Fed.Reg. at 1736. No such agreements were collateral to the Lake Park investments.

First, although many of the Lake Park investors were seeking rental income, there was no rental arrangement within the contemplation of the SEC Release. "[A]n owner of a condominium unit may, after purchasing his unit, enter into a non-pooled rental arrangement with an agent not designated or required to be used as a condition to the purchase, whether or not such agent is affiliated with the offeror, without causing a sale of a security to be involved in the sale of the unit." 38 Fed.Reg. at 1736. There is no allegation that the purchase of a Lake Park condominium was in any way conditioned upon participation in a rental arrangement. *See Dumbarton,* 657 F.Supp. at 231; *Mosher,* 552 F.Supp. at 1233. Some plaintiffs contracted to have Harvey Freeman & Sons, Inc. serve as their rental agent, but that indicates only that they "bought their units purely as an investment, that is, not to live in, but to rent out." *Johnson v. Nationwide Industries, Inc.,* 450 F.Supp. 948, 953 (N.D.Ill.1978) (no security even though some purchasers bought units as passive investments). Second, as discussed earlier, there is no showing of a rental pool arrangement. Third, SEC Realty placed no limitations on plaintiffs' use of their units; nor were the plaintiffs, in the event they chose to rent their units, bound to use an exclusive rental agent. In short, there was no collateral agreement of the kind envisioned in the SEC release, no common enterprise within the meaning of *Howey,* and no investment contract.

## B.  The RICO Claims

Plaintiffs allege that the conduct of the SEC Realty defendants amounts to a pattern of racketeering in violation of RICO, 18 U.S.C. §§ 1961 *et seq.* To state a claim for damages under RICO, plaintiffs must first demonstrate that the defendants' conduct constitutes "racketeering activity" as defined in 18 U.S.C. § 1961(1). Here, plaintiffs rely solely on the RICO provision that defines "racketeering activity" to include "fraud in the sale of securities . . . punishable under any law of the United States." 18 U.S.C. § 1961(1)(D). In light of our determination that the sale of Lake Park units does not constitute the sale of securities, plaintiffs' RICO claims necessarily fail. *See Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17–20 (2d Cir.1983) (where the underlying securities violations are dismissed for failure to state a claim, the attendant RICO claims must also be dismissed), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *see also Kefalas v. Bonnie Brae Farms, Inc.,* 630 F.Supp. 6, 9 (E.D.Ky.1985) (no "racketeering activity" where transactions did not involve sale of securities as alleged). The dismissal of the RICO claims is therefore affirmed.

## C.  Common Law Claims

Plaintiffs allege that the discrepancies in the debt instruments and the nondisclosure of the gas well constitute common law fraud or, in the alternative, negligent misrepresentation. We disagree.

### 1.  The Debt Instruments

The district court dismissed the common law claims arising out of the altered debt instruments because plaintiffs failed to demonstrate loss causation. "The absence of adequate causation is . . . fatal to a common law fraud claim under New York law." *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 316 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). The requisite causation is established only where the loss complained of is a

direct result of the defendant's wrongful actions and independent of other causes. *Id.* In this appeal, there is no allegation that the default provisions of the adjustable-rate note or the deed of trust have ever been invoked; the only detriment asserted by plaintiffs is that they "were saddled with notes and deeds of trust whose default terms were far more onerous than they had been prepared to agree to." Accordingly, plaintiffs have not identified *any* loss attributable to the changed terms of the debt instruments, much less a loss that was the direct result of such changes.

█ For the same reason, the district court properly dismissed plaintiffs' claim for negligent misrepresentation. Like any cause of action sounding in negligence, negligent misrepresentation requires a showing of proximate cause. *Boccardo v. Citibank, N.A.,* 152 Misc.2d 1012, 579 N.Y.S.2d 836, 837 (N.Y.Sup.Ct.1991). Here, plaintiffs have failed to allege any injury caused proximately (or otherwise) by the changed terms of the debt instruments presented at closing.

### 2. The Gas Well

In alleging that the SEC Realty defendants' nondisclosure of the gas well gives rise to liability at common law, plaintiffs lean heavily on the disclosure requirements imposed by the federal securities laws. However, given our holding that the Lake Park offering falls outside of the definition of a "security", we need only consider the disclosure obligations of real property vendors in Tennessee.

█ Ordinarily, sellers of Tennessee real estate are bound only by their express representations and covenants. Although the SEC Realty defendants covenanted to deliver marketable title, the common law claims alleged are fraud or negligent misrepresentation (not breach of covenant). "Concealment or nondisclosure becomes fraudulent only when there is an existing fact or condition, as distinguished from a mere opinion, to be disclosed, and when there is a duty of disclosure upon the party having knowledge of such fact or condition." *Dozier v. Hawthorne Development Co.,* 37 Tenn.App. 279, 262 S.W.2d 705, 711 (1953). No duty of disclosure exists unless: (i) the parties are in a fiduciary relationship, (ii) each of the parties to the contract expressly reposes trust and confidence in the other, or (iii) the transaction is intrinsically fiduciary. *See Wyner v. Athens Utilities Board,* 821 S.W.2d 597, 599 (Tenn.Ct.App.1991). Absent such a special relationship, the sale of land in Tennessee is subject to the rule of caveat emptor. *See McIntosh v. Goodwin,* 40 Tenn.App. 505, 292 S.W.2d 242, 249 (1954); *Dozier,* 262 S.W.2d at 711.

█ No special relationship exists between the plaintiffs and SEC Realty (or its counsel) to justify imposing a duty to disclose the gas well. *See Hays v. Gilliam,* 655 S.W.2d 158, 161 (Tenn.Ct.App.1983) (no duty to disclose adequacy of sewer system). The parties dealt with each other at arm's length, and the plaintiffs had "as many reasonable opportunities for ascertaining all the facts as any other person in [their] place would have had." *Dozier,* 262 S.W.2d at 711. The district court found that purchasers were on notice of the right to sink the gas well, because the right was reflected in the easement granted by the prior owner of the Lake Park property. Having made no search or inquiry, the purchasers cannot claim nondisclosure by the SEC Realty defendants under Tennessee law. Accordingly, the failure to disclose the gas well did not give rise to liability for either fraud or negligent misrepresentation.

█ Plaintiffs contend that the filing of the Offering Plan in accordance with New York's Martin Act, *see* N.Y.Gen.Bus.Law art. 23–A, created a special relationship or an additional disclosure obligation. The registration requirements of the Martin Act are designed to protect the public from fraudulent investments. However, it is "now well settled that there is no private cause of action under the Martin Act." *Rego Park Gardens Owners, Inc. v. Rego Park Gardens Associates,* 191 A.D.2d 621, 595 N.Y.S.2d 492, 494 (2d Dept.1993). Only the New York attorney general may bring suit to enforce its provisions, including its disclosure requirements. Plaintiffs ask us to expand common law disclosure obligations to allow reliance

upon disclosures and representations required by the Martin Act, effectively creating a private right of action under the Martin Act. We are not prepared to permit plaintiffs to use a common law claim to circumvent the standing requirements of the Martin Act.

## II. THE BANKS

Without disputing that Boatmen's Bank and Sovran Bank are holders in due course, plaintiffs nevertheless seek rescission of the promissory notes and the deeds of trust by characterizing their claim as fraud in the factum (which would defeat the claims of a holder in due course). Finding that the claim at worst amounts to fraud in the inducement (which would not), the district court granted the Banks' motion for summary judgment and dismissed plaintiffs' fraud claim.

 The distinction between fraud in the factum and fraud in the inducement is basic: "Fraud in the factum occurs when 'the maker [of the note] is tricked into believing that which he is signing is something other than a promissory or obligatory note'. By contrast, fraud in the inducement consists of misrepresentations that cause the maker of the note to enter the transaction." *Generale Bank, New York Branch v. Choudhury*, 779 F.Supp. 306, 310 (S.D.N.Y.1991) (citations omitted). Fraud in the factum occurs in those "rare cases" where "the misrepresentation is regarded as going to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect." E.A. Farnsworth, *Contracts* § 4.10 (1990). We agree with the district court that, if the conduct alleged here were fraud, it would be fraud in the inducement, not fraud in the factum. The debt instruments executed by plaintiffs at closing differed somewhat from the specimen documents furnished in the Offering Plan, but that does not undermine the district court's conclusion that plaintiffs nevertheless "were signing just what they thought they were signing: a note and a deed." Therefore, the fraud claim against the Banks, as holders in due course, was properly dismissed.

## CONCLUSION

Since the sale of Lake Park units did not constitute the sale of "securities" for purposes of the federal securities laws, we affirm the district court's dismissal of the § 12(2) and § 10(b) claims as well as the dismissal of the attendant RICO claims. We affirm dismissal of the common law claims, because the alteration of the debt instruments caused no injury to the plaintiffs, and because the SEC Realty defendants were under no duty to disclose the gas well. Finally, we affirm dismissal of the fraud claim against the Banks as there is no showing that the debt instruments were procured through fraud in the factum.