Peter COSTA; Jeffry Johnson; Justyna Johnson; Gehele Anderson Properties, LLC, a Minnesota limited liability company; and JVK Investco, LLC, a Minnesota limited liability company, Plaintiffs,

v.

CARAMBOLA PARTNERS, LLC, a Florida limited liability company; JS Carambola, LLP, a United States Virgin Islands limited liability partnership; John L. Puls, Jr.; James Puls; Larry Vaughn; XYZ Corporation, ABC Partnership, John Doe, and Mary Roe, whose true names are unknown to plaintiffs; and every person

1142

or entity who either directly or indirectly controls Carambola Partners, as well as all employees of Carambola Partners who materially aided in the disposition of unregistered securities, Defendants.

Case No. 08–CV–0567 (PJS/RLE).

United States District Court,
D. Minnesota.

Dec. 17, 2008.

Robert B. Bauer, William M. Topka, and Michael G. Dougherty, Severson, Sheldon, Dougherty & Molenda, P.A., for plaintiffs.

Scott A. Neilson and Wesley T. Graham, Henson & Efron, P.A.; and Denis L. Durkin and Kirk D. Johnson, Baker & Hostetler LLP, for defendants.

## ORDER

PATRICK J. SCHILTZ, District Judge.

This matter is before the Court on the motion of defendant Carambola Partners, LLC ("Carambola") to dismiss Counts I, II, and III of plaintiffs' complaint. For the reasons set forth below, the Court grants the motion with respect to Counts II and III, but denies the motion with respect to Count I.[1]

## I. BACKGROUND

This case arises out of the planned conversion of a Virgin Islands beach resort into residential condominiums. Plaintiff Peter Costa entered into a "Reservation Agreement" with Carambola, under which Costa paid a "deposit" of $310,000 and received in return the "opportunity" to purchase one of the planned condominiums. The other plaintiffs signed similar contracts.[2]

At the time Costa and Carambola signed the contract, however, Carambola was not the owner of the beach resort and was not involved in the renovation. Instead, the beach resort was owned and being renovated by another entity, defendant JS Carambola LLP ("JSC"). As recited in the contract, Carambola "ha[d] entered into an arrangement with [JSC] pursuant to which [Carambola] may purchase from [JSC] certain of the condominium units" in the project. Compl. Ex. A at 1. In return for Costa's $310,000, Carambola promised Costa that, when it was "ready to sell" the

1. The Court previously denied, without prejudice, a Rule 12(b)(2) motion filed by defendants JS Carambola, LLP, John L. Puls, Jr., James Puls, and Larry Vaughn. The Court denied the motion in order to give plaintiffs an opportunity to engage in limited discovery on the issue of personal jurisdiction.

   As an alternative to their Rule 12(b)(2) motion, these four defendants join in Carambola's Rule 12(b)(6) motion to dismiss Counts I, II, and III for failure to state a claim. As far as the Court is aware, however, these defendants still dispute the issue of personal jurisdiction, and it would therefore be premature for the Court to make any rulings on the merits of the claims against them. The Court notes, though, that plaintiffs have not suggest-

ed any reason why the Court's analysis of the merits would be different as to these defendants. Thus, if the Court eventually finds that it has personal jurisdiction over these defendants, the Court will almost surely dismiss Counts II and III against them for the reasons stated in this opinion.

2. Although each plaintiff entered into a similar contract with Carambola, only Costa's contract is in the record. Compl. Ex. A. As discussed in the text, Costa and Carambola later amended the contract, Compl. Ex. B, and the other plaintiffs allege that their contracts were similarly amended. To simplify the discussion, the Court will describe only Costa's contract, with the understanding that its description applies to all contracts at issue.

condominium that was the subject of the contract, it would deliver a purchase agreement to Costa, who would then have seven days to decide whether to accept the unit and sign the purchase agreement. Compl. Ex. A at 2. If Costa signed the purchase agreement, the $310,000 would be treated as a down payment on the unit. But the contract explicitly warned Costa that "no assurance is given that the unit, or any units at all, will be available to prospective purchasers since [Carambola] may decide not to undertake the offering of units described in this reservation agreement." [3] Compl. Ex. A at 2. Moreover, although the contract refers to the "Unit which is the subject of this Reservation Agreement," the contract did not actually specify a particular condominium as the subject of the contract; instead, the parties left that space blank. Compl. Ex. A at 1. In other words, the agreement made clear that Carambola was not required to acquire any condominiums—and, even if it did acquire condominiums, Carambola was not obligated to offer any of those condominiums to Costa.

So why would Costa pay $310,000 for an "opportunity" to purchase an unspecified condominium from a seller who did not own any condominiums and who was under no obligation to acquire or offer any condominiums? The answer can be found in another provision of the contract: At any time before the parties executed a purchase agreement on a condominium, either party could terminate the contract, at which time Carambola would return the $310,000 deposit plus a "cancellation fee" of $115,000, for a total of $425,000. Compl. Ex. A at 2. In other words, all Costa had to do to earn $115,000 on a $310,000 investment—a return of 37%—was to cancel an agreement that did not

require Carambola to offer anything and did not require Costa to buy anything.

Even if Carambola did offer a condominium to a plaintiff, no rational plaintiff would decide to buy it. If a plaintiff did not buy a condominium, the plaintiff got back $425,000. If a plaintiff did buy a condominium, the plaintiff got back only $310,000 (plus interest) in the form of a down payment on the condominium. It is not possible to know precisely how much the total down payment would be—the parties apparently considered this option so unlikely that they did not bother to fill in the amount of interest on the appropriate line—but it seems safe to assume that the down payment would be considerably less than $425,000. (Under the contract, the $310,000 deposit does not accrue *any* interest for the first six months.) In other words, nothing about the original deal gives any indication that any plaintiff was interested in buying a condominium, as opposed to earning a huge return on an investment.

The original contract required that the $425,000 refund-plus-cancellation fee be paid no later than one year from the date of the contract. Compl. Ex. A at 2. About a year after signing the contract, Carambola sent Costa a letter stating that the project was behind schedule and asking for an extension. Compl. Ex. B. In return for a nine-month extension, Carambola proposed making an immediate interest payment of $31,000 and another interest payment of $23,250 after nine months, at which time Carambola would also refund the $310,000 and pay a cancellation fee of $125,000. All told, Carambola proposed paying Costa $489,250 in return for his initial $310,000 investment—a 58% return. Compl. Ex. B at 1. Included with

---

**3.** The language in the original is all in upper case; the Court reproduces it in lower case for purposes of legibility.

the letter was a proposed amendment incorporating the terms stated in the letter. Costa alleges that he signed the proposed amendment, although the copy in the record is not signed. The other plaintiffs allege that they received similar letters and signed similar amendments.[4]

Plaintiffs now contend that more than nine months have passed since they signed the amendments and Carambola has not paid the amounts due and owing under the contracts. Plaintiffs bring six counts against numerous defendants, including Carambola, the entity that signed the contracts; JSC, the entity that owned the beach resort that was under renovation; a number of individuals who plaintiffs allege were in control of Carambola; and several unknown entities and persons who are alleged to be in control of Carambola or otherwise responsible for its actions. In addition to claims of breach of contract, unjust enrichment, and conversion, plaintiffs bring statutory claims under federal and state law. Carambola seeks dismissal of plaintiffs' statutory claims.

## II. ANALYSIS

### A. *Standard of Review*

In reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.,* 511 F.3d 818, 820 (8th Cir.2008); *Maki v. Allete, Inc.,* 383 F.3d 740, 742 (8th Cir.2004); *Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 697 (8th Cir.2003). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level. . . ." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, the motion must be treated as a motion for summary judgment. Fed. R.Civ.P. 12(d). But the court may consider materials that are necessarily embraced by the complaint, as well as any exhibits attached to the complaint, without converting the motion into one for summary judgment. *Mattes,* 323 F.3d at 697 n. 4.

### B. *Count I*

In Count I, plaintiffs allege that defendants sold an unregistered security in violation of the federal Securities Act of 1933, 15 U.S.C. §§ 77a et seq. Carambola argues that this claim should be dismissed because the contracts at issue are not "securities" within the meaning of the 1933 Act.

The 1933 Act defines "security" as follows:

> When used in this subchapter, unless the context otherwise requires—
>
> (1) The term "security" means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in gen-

---

4. The letter sent to plaintiffs gives no hint that any plaintiff may have entered the deal in order to buy a condominium. To the contrary, the letter plainly reflects the assumption that plaintiffs were interested only in earning a large return on their investments.

eral, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1). Plaintiffs argue that the contracts are "securities" because they are "notes," "evidence of indebtedness," and "investment contracts." The Court considers each type of security in turn.

### 1. Notes

Although the definition of "security" includes "any note," the Supreme Court has held that this language cannot be given its literal meaning. *Reves v. Ernst & Young,* 494 U.S. 56, 62–63, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990).[5] After all, an I.O.U. given by a child to a parent is literally a "note," but no one believes that such a note is a "security" to which the 1933 Act applies. Rather, "note" must be interpreted in light of Congress's purpose in enacting the securities laws: "to regulate *investments,* in whatever form they are made and by whatever name they are called." *Id.* at 61, 62–63, 110 S.Ct. 945. Recognizing that a "note may now be viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context," the Supreme Court in

*Reves* adopted a test for distinguishing between notes that are "securities" and notes that are not. *Id.* at 62, 65, 110 S.Ct. 945 (citation and quotations omitted). Generally speaking, the test draws a distinction between notes issued in an investment context (which are "securities") and notes issued in a commercial or consumer context (which are not). *Id.* at 63, 64, 110 S.Ct. 945.

■ Under the *Reves* test, there is a presumption that every note is a security. *Reves,* 494 U.S. at 65, 110 S.Ct. 945. But Carambola argues that the *Reves* presumption does not apply to the contracts at issue in this case because those contracts are not "notes" at all. Instead, Carambola contends, the contracts are reservation agreements for condominiums. The Court disagrees.

It is true, as Carambola points out, that the contracts are entitled "Reservation Agreements." But in determining whether a particular instrument is a "security," courts are guided not by legal formalism, but by economic substance. *Reves,* 494 U.S. at 61, 110 S.Ct. 945. The economic substance of the parties' transactions is plainly not the reservation of condominiums. The contracts did not require Carambola to acquire any condominium, and the contracts did not require Carambola to offer any condominium that it did acquire to any plaintiff. Indeed, the contracts did not even give plaintiffs a right of first refusal over condominiums offered for sale by Carambola.[6] Carambola could have ac-

---

**5.** *Reves* concerned the definition of "security" in the Securities Exchange Act of 1934, but the Supreme Court has long held that the definition of "security" in the 1934 Act and the definition of "security" in the 1933 Act are virtually identical. *Reves,* 494 U.S. at 61 n. 1, 110 S.Ct. 945.

**6.** One provision of the contract does state that "[w]hen [Carambola] is ready to sell the Unit which is the subject of this Reservation Agreement, [Carambola] shall deliver a copy" of a

purchase agreement to the plaintiff who signed the agreement. *See* Compl. Ex. A at 2. But the contract nowhere identifies "the Unit," and thus Carambola's promise appears to be illusory. Carambola could offer hundreds of condominiums for sale to the general public and simply claim that none of those condominiums was "the Unit" referred to in a particular contract. But even if plaintiffs had some type of right of first refusal under the contracts, the value of that right would be

quired hundreds of condominiums and offered them for sale to everyone *except* plaintiffs without violating the contract. In short, these "Reservation Agreements" reserved nothing.

Moreover, as explained above, it would have been *irrational* for any plaintiff to have purchased a condominium under the contract, even if Carambola offered to sell one. Under the original deal, a plaintiff who did not buy a condominium received $425,000, while a plaintiff who did buy a condominium received only $310,000 plus interest. The parties considered it so unlikely that any plaintiff would buy a condominium that the original contract did not even bother to identify "the Unit which is the subject of this Reservation Agreement" or to specify the amount of interest that a plaintiff would receive if he bought a condominium. It is obvious that these "Reservation Agreements" had nothing to do with purchasing condominiums and everything to do with earning large returns on $310,000 investments.

A "note" is "[a] written promise by one party (the maker) to pay money to another party (the payee) or to bearer." *Black's Law Dictionary* 1088 (8th ed. 2004). The contracts at issue in this case fit this definition precisely; as amended, they evidence a written promise by Carambola to pay $489,250 to each plaintiff. True, some authorities indicate that, to be considered a "note," the instrument must contain an *unconditional* promise to pay. *See Fed. Deposit Ins. Corp. v. Phila. Gear Corp.,* 476 U.S. 426, 434, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986) (noting that, during the 1930s, "instruments denominated 'promissory notes' seem ... to have been considered exclusively uncontingent"); *Gilman v. Commissioner,* 53 F.2d 47, 50 (8th Cir. 1931) (holding, under Iowa law, that instruments were "not promissory notes because not unconditional promises to pay"); Uniform Commercial Code § 3–104(a), (e) (defining "note" as a type of negotiable instrument, which is "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges"). But even if an unconditional promise is a necessary feature of a note, the parties' contracts still qualify as notes.

Carambola was absolutely required to repay the money loaned by plaintiffs. Carambola had no power to alter or extinguish that debt. It is true that a plaintiff could later give Carambola permission to take the money owed to the plaintiff and apply it to the price of a condominium. But a lender can *always* give a debtor permission to use the lender's money in some fashion. When Party A borrows $25,000 from Party B and agrees to repay the $25,000 in one year, Party A has made an unconditional promise to pay. That is true even though nothing would prevent Party A from later proposing a new deal to Party B, and nothing would prevent Party B from accepting that proposal. For example, Party A could propose—and Party B could agree—that, instead of paying $25,000 to Party B, Party A will make a $25,000 down payment on a luxury automobile for Party B. But the fact that the parties can *change* the deal does not alter the fact that, under the deal, Party A is unconditionally obligated to pay $25,000 to Party B.

The deal between plaintiffs and Carambola is in substance indistinguishable from the deal between Party A and Party B. The only thing that Carambola is *obligated* to do is pay money, and the only thing that plaintiffs have a *right* to receive is money. True, Carambola can—but does not have

dwarfed by the value of the enormous returns that Carambola promised on plaintiffs' investments.

to—offer a condominium to a plaintiff, and a plaintiff can—but does not have to—give Carambola permission to apply the money owed to the plaintiff as a down payment on that condominium. But the fact that the contracts memorialize a nonbinding alternative to Carambola's obligation to pay the debts does not make Carambola's obligation to pay the debts any less absolute. The Court therefore holds that the contracts between plaintiffs and Carambola are notes.

■ Because these contracts are notes, they are presumed to be securities governed by the 1933 Act. *Reves*, 494 U.S. at 65, 110 S.Ct. 945. Under *Reves*, this presumption can be rebutted in one of two ways. First, Carambola could show that the contracts bear a "family resemblance" to a judicially created list of notes that are not considered "securities" (such as notes secured by a mortgage or notes delivered in consumer financing). *Id.* at 64–65, 110 S.Ct. 945. But Carambola concedes that the contracts do not bear a "family resemblance" to any of the notes on the judicially created list. Docket No. 50 at 6. Second, if the notes do not bear a resemblance to any note on the list, Carambola could demonstrate that the contracts are of a type that should be added to the list. *Reves*, 494 U.S. at 66, 110 S.Ct. 945. Carambola makes precisely that argument.

In *Reves*, the Supreme Court described a set of factors that lower courts can apply in determining whether a particular type of note should be added to the list, including the following: (1) whether a reasonable buyer and seller would be motivated to enter into the transaction for investment-like purposes or, instead, would be moti-

vated by the desire to facilitate the purchase of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose; (2) the "plan of distribution" of the instruments—that is, whether they were offered and sold to a broad segment of the public; (3) the reasonable expectations of the investing public; and (4) any other factor—such as the existence of another applicable regulatory scheme—that would significantly reduce the risk of the investment and render the application of the securities laws unnecessary. *Reves*, 494 U.S. at 66–68, 110 S.Ct. 945.

These factors obviously depend, at least in part, on evidence extrinsic to the contracts at issue, and a final determination of their weight and import must await development of the factual record.[7] But the nature of the contracts themselves, as well as the facts alleged in the complaint, point strongly to the conclusion that, under the *Reves* factors, the contracts offered by Carambola are securities.

As described above, all evidence in the record suggests that the only purpose of plaintiffs in entering the contracts was to earn a large return on their investments, and the only purpose of Carambola in entering the contracts was to gain financing for the conversion of the resort into condominiums. There is no evidence that any plaintiff was interested in buying a condominium, nor is there any evidence that Carambola expected to sell a condominium to any plaintiff. Indeed, as both the original and amended deals were structured, it would have been irrational for any plaintiff to have purchased a condominium from

---

**7.** For example, the parties will undoubtedly develop evidence about whether any of the plaintiffs had ever visited the site of the condominiums, whether any of the plaintiffs was in the market for a new condominium, and whether and to what the extent any of the plaintiffs asked questions about the condominiums or otherwise gave some indication that they were being motivated by a desire to purchase a condominium rather than by a desire to earn a large return on their investment.

Carambola. Consideration of the first factor thus points strongly toward a finding that the contracts are securities. *See Reves,* 494 U.S. at 66, 110 S.Ct. 945 ("If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'").

At this early stage, there is not a lot of information pertaining to the second and third factors of the *Reves* test. But in light of all that has been said about these contracts, it is reasonable to infer that, to the extent that the contracts were marketed to the public, they were marketed as investments, and the public would have seen them in that light. In addition, the fact that there are five plaintiffs in this action—all of whom entered into the same contract involving the same dollar amounts, and all of whom lived a very long way from the location where their money was to be put to use—certainly suggests some sort of widespread and concerted marketing effort.

As for the existence of some other factor that would significantly reduce the risk of the investment, Carambola argues that there is a regulatory scheme for condominiums which requires that condominium documents be filed and recorded after review by government officials. It is not exactly clear to what Carambola is referring; Carambola cites no laws or regulations. But assuming that Carambola is merely referring to state-law systems for recording title to real property, this is not the sort of comprehensive and substantial "regulatory scheme" that would significantly reduce an investor's risk. *Cf. Reves,* 494 U.S. at 69, 110 S.Ct. 945 (citing the "substantial" regulatory system of the federal banking laws and the "comprehensive[ ]" regulatory system of the Employee Retirement Income Security Act as exam-ples of regulatory schemes that would reduce an investor's risk and render the application of the securities laws unnecessary). Moreover, this "regulatory scheme" of recording title to real property is at most tangentially relevant to this case, as the contracts at issue do not transfer or create any interest in any property other than money.

At this early point in the litigation, the Court cannot hold that the contracts are, in fact, "securities" within the meaning of the 1933 Act. But all of the *Reves* factors seem to be pointing in that direction. The Court therefore denies defendants' motion to dismiss.

### 2. Evidence of Indebtedness

Given the Court's conclusion that the contracts are likely "notes" within the meaning of § 77b(a)(1), they are also likely "evidence of indebtedness." *See United States v. Jones,* 450 F.2d 523, 525 (5th Cir.1971) ("[t]he term 'evidence of indebtedness' embraces ... promissory notes"); 2 Louis Loss et al., *Securities Regulation* 900 (4th ed. 2007) (noting that the criteria developed for determining whether an instrument is a "note" within the meaning of the securities laws should also be helpful in determining whether an instrument is "evidence of indebtedness").

### 3. Investment Contract

In *S.E.C. v. W.J. Howey Co.,* the Supreme Court examined the meaning of "investment contract" in § 77b. 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Court noted that, under state "blue sky" laws, the term "investment contract" had come to mean "a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'" *Id.* at 298, 66 S.Ct. 1100 (quoting *State v. Gopher Tire & Rubber Co.,* 146 Minn. 52, 177 N.W. 937, 938 (1920)). The Court held that when Congress used the term "investment

contract" in the 1933 Act, Congress intended to adopt this commonly understood meaning of the term. *Id.* Under *Howey*, therefore, an investment contract is a "security" if it meets the following criteria: (1) there is an investment of money (2) in a common enterprise (3) with the reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others. *Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 700 (8th Cir.1999).

Carambola does not seriously dispute that the contracts at issue in this case are "investment contracts" under the general *Howey* test. Instead, Carambola argues that the courts and the SEC have developed a particular application of the *Howey* test for contracts involving the sale of condominiums. *See, e.g., Revak v. SEC Realty Corp.*, 18 F.3d 81, 88–89 (2d Cir.1994); *Mosher v. Southridge Assocs., Inc.*, 552 F.Supp. 1231, 1232–33 (W.D.Pa.1982); *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, Securities Act of 1933 Release No. 33–5347, 1973 WL 158443 (Jan. 4, 1973). According to Carambola, these authorities indicate that a contract for the offer or sale of a condominium is not an "investment contract" unless it includes certain "collateral agreements"—such as a provision requiring the purchaser to make the unit available for rental for part of the year. *See Revak*, 18 F.3d at 89. Because its contracts do not contain any of these types of "collateral agreements," Carambola argues, they are not "investment contracts."

The problem for Carambola is that all of the authorities on which it relies concern contracts for the offer or sale of condominiums. As discussed earlier, the contracts at issue in this case are *not* contracts for the offer or sale of condominiums. They do not require Carambola to offer any condominium, and they do not require plaintiffs to buy any condominium. It is therefore irrelevant that the contracts do not contain any of the "collateral agreements" necessary to turn the offer or sale of a condominium into an "investment contract."

Carambola does take a half-hearted stab at a general *Howey* analysis when it states, in conclusory fashion, that "[t]he present case does not involve an investment of money or a common enterprise; it was a reservation to purchase a condominium in a first class resort." Docket No. 50 at 4. But this statement is erroneous in at least two respects. First, as the Court has repeatedly pointed out, the contracts were *not* reservations to purchase condominiums. Second, the contracts obviously involved an investment of money; pursuant to the contracts, plaintiffs made upfront payments of $310,000 each. Whether the contracts involved a "common enterprise" or involved a "reasonable expectation of profit" may present closer questions, but they are questions that Carambola has not briefed beyond the conclusory statement quoted above, and the Court therefore declines to address them.

In sum, the Court concludes that the contracts are almost surely both "notes" and "evidence of indebtedness" within the meaning of § 77b, and that the only reason Carambola has advanced for its position that the contracts are *not* "investment contracts" lacks merit. Plaintiffs' complaint is thus more than sufficient to "raise a right to relief above the speculative level," *Bell Atlantic Corp.*, 127 S.Ct. at 1964–65, and Carambola's motion is denied as to Count I.

### C. Counts II and III

Counts II and III of plaintiffs' complaint assert claims under Minnesota statutes. In Count II, plaintiffs allege that defendants sold unregistered securities in viola-

tion of the Minnesota Securities Act ("MSA"), Minn.Stat. §§ 80A.01 et seq. (2007).[8] In Count III, plaintiffs allege that defendants sold unregistered subdivided lands in violation of the Minnesota Subdivided Land Sales Practices Act, Minn.Stat. §§ 83.20 et seq. ("MSLSPA").

The contracts between plaintiffs and Carambola contain choice-of-law clauses requiring that the contracts "shall be construed and regulated under and by the laws of the United States Virgin Islands...." Compl. Ex. A at 3. Carambola argues that, because the contracts are governed by the law of the Virgin Islands, plaintiffs' claims under the MSA and the MSLSPA must be dismissed. Plaintiffs respond that the MSA and the MSLSPA contain anti-waiver provisions that render ineffective the parties' choice-of-law clauses. As the anti-waiver provisions in each statute are different, the Court will examine them separately.

### 1. The MSA

The anti-waiver provision of the MSA states that "[a]ny condition, stipulation or provision binding any person to waive compliance with any provision of sections 80A.01 to 80A.31 or any rule or order hereunder in the purchase or sale of any security is void." Minn.Stat. § 80A.23, subd. 10 (2007). In *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, the Eighth Circuit held that an essentially identical anti-waiver provision in the Minnesota Franchise Act was not sufficient to overcome Minnesota's countervailing policy in favor of enforcing contractual choice-of-law provisions. 871 F.2d 734, 738–740 (8th Cir.1989) (en banc). Instead, the court held, the parties' choice of Nebraska law was valid and precluded the

plaintiffs' claim under the Franchise Act. *Id.* at 738.

The result in *Modern Computer Systems* would seem to dictate that the parties' choice of Virgin Islands law is enforceable and precludes a claim under the MSA. In response to *Modern Computer Systems*, however, the Minnesota legislature amended the Franchise Act's anti-waiver provision to explicitly provide that the protections of the Franchise Act cannot be waived through a contractual choice-of-law clause. *See* Minn.Stat. § 80C.21 (stating that, with respect to Minnesota residents, "[a]ny condition, stipulation or provision, *including any choice of law provision*" purporting to waive compliance with the Franchise Act is void) (emphasis added). When it approved this amendment, the legislature stated that the amendment was "a restatement and clarification of the legislative intent ... and must not be construed as a modification of existing law." 1989 Minn. Laws ch. 198 § 3 (May 19, 1989). In other words, the legislature expressed the opinion that, in *Modern Computer Systems*, the Eighth Circuit had wrongly interpreted the prior version of the Franchise Act to permit enforcement of choice-of-law clauses. If the Eighth Circuit was indeed wrong in interpreting the original anti-waiver provision of the Franchise Act, then perhaps this Court should interpret the similarly worded anti-waiver clause in the MSA to bar enforcement of choice-of-law clauses.

The problem is that interpreting statutes is the function of the judicial branch, not the legislative branch. The Minnesota legislature can amend a statute to make clear what the statute should mean *going*

---

8. The former Minnesota Securities Act, Minn. Stat. §§ 80A.01 et seq., was repealed effective August 1, 2007 and replaced with the Uniform Securities Act. *See* Minn.Stat. §§ 80A.40 et seq. Plaintiffs' complaint cites to the for- mer version of the statute, which was in effect at the time they entered into their contracts. All citations to Chapter 80A of the Minnesota Statutes are to the version in effect before August 1, 2007.

forward, but it is up to the courts to determine the meaning of a statute enacted in the past. This point was made clear by the Minnesota Supreme Court in *Minnegasco, Inc. v. County of Carver*, 447 N.W.2d 878 (Minn.1989). Shortly before oral argument in *Minnegasco*, the Minnesota legislature passed an amendment that was, in the words of the legislature, "intended to confirm and clarify the original intent of the legislature." *Id.* (citation and quotations omitted). The Minnesota Supreme Court held that the amendment should not be given retroactive effect because "[i]t is problematical whether the 1989 legislature knew the mind of the 1981 legislature." *Id.* Clearly, then, a later legislature's pronouncements about a previous legislature's intent are not relevant to the Court's analysis. *See also Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 874 (8th Cir.1991) (relying on *Minnegasco* to hold that the 1989 amendment to the Franchise Act does not apply to a franchise agreement executed before the amendment).

In this case it would be doubly "problematical" to rely on the statement made by the Minnesota legislature in amending the Franchise Act to discern the meaning of the MSA. The Court would first have to assume that the Minnesota legislature was correct—and the Eighth Circuit incorrect—about the meaning of the original version of the anti-waiver provision in the Franchise Act. The Court would then have to go further and assume that what a later legislature said about what an earlier legislature intended in enacting the *Franchise Act* also applied to what the earlier legislature intended in enacting the *MSA*. The Court is unwilling to go so far.

The Court is bound by *Modern Computer Systems*. As described, in *Modern Computer Systems*, the Eighth Circuit held that the Franchise Act's original anti-waiver provision did not invalidate a contractual choice-of-law clause. The MSA's anti-waiver provision is substantively identical to the anti-waiver provision considered in *Modern Computer Systems*. Thus, the Court holds that the MSA's anti-waiver provision does not bar enforcement of the parties' contractual choice of Virgin Islands law. Plaintiffs' claims under the MSA must therefore be dismissed.[9]

### 2. The MSLSPA

■ The MSLSPA's anti-waiver provision is much narrower than the anti-waiver provision of the MSA. Unlike the MSA provision, the MSLSPA provision does not address whether the MSLSPA as a whole can be waived. Instead, it merely provides that "[n]o act of a purchaser shall be effective to waive the right to rescind as provided in this section." Minn.Stat. § 83.28, subd. 7. In other words, as to land sales governed by MSLSPA,[10] a purchaser's right to rescind is unwaivable. Whether or not the MSLSPA as a whole can be waived, however, is a different question—a question about which the anti-waiver provision has nothing to say. The

9. In holding that the parties' choice-of-law provision was a valid waiver of the Franchise Act, *Modern Computer Systems* adopted the analysis set out in *Tele–Save Merchandising Co. v. Consumers Distributing Co.*, 814 F.2d 1120 (6th Cir.1987). *Modern Computer Sys.*, 871 F.2d at 738–39. Under this analysis, in addition to considering the parties' contractual choice of law and the anti-waiver provision of the Franchise Act, the Eighth Circuit also considered the parties' relative levels of bargaining power and the relative number of contacts between the parties and the two potential forum states. *Id.* at 739–40. Plaintiffs have not argued that these factors preclude application of Virgin Islands law, nor have they undertaken their own *Tele–Save* analysis.

10. The Court is skeptical that the MSLSPA applies to the sale of land in the Virgin Islands by citizens of Florida, but the Court need not reach that question given its decision enforcing the choice-of-law clause.

parties' choice of law must therefore control. As the parties have contractually agreed to apply Virgin Islands law, the Court holds that plaintiffs are precluded from bringing a claim under the MSLSPA. Defendants' motion to dismiss Count III of plaintiffs' complaint is therefore granted.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. The motion of defendant Carambola Partners, LLC to dismiss Counts I, II, and III of plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6) [Docket No. 14] is GRANTED IN PART AND DENIED IN PART.

2. The motion is GRANTED with respect to Counts II and III of plaintiffs' complaint, and those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS as to defendant Carambola Partners, LLC.

3. The motion is DENIED in all other respects.